79 P.3d 86

**EASTERN VANGUARD FOREX, LTD.; Eastern Vanguard Group Limited; K. (David) Sharma; Sammy Lee Chun Wing; Peter Suen Suk Tak; Michael E. Cho; To Fai Cheng; Jean Yuen; Wing Ming Tam and Guo Quan Zhang, Plaintiffs–Appellees, Cross–Appellants,**

v.

**ARIZONA CORPORATION COMMISSION, an administrative agency of the State of Arizona, Defendant–Appellant, Cross–Appellee.**

No. 1 CA–CV 01–0476.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 30, 2003.

Roshka Heyman & DeWulf, PLC, By Alan S. Baskin, Phoenix, Attorneys for Plaintiffs–Appellees/Cross–Appellants.

Terry Goddard, Attorney General, By Kathleen Coughenour DeLaRosa, Special Assistant Attorney General and Moira A. McCarthy, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellant/Cross–Appellee.

**OPINION**

HALL, Judge.

¶ 1 This is an appeal and a cross-appeal from the superior court's partial affirmance and partial reversal of an Arizona Corporation Commission (Commission) decision. The Commission appeals from the superior court's reversal of its finding of "control liability" under the Arizona Securities Act [1] as to three individuals—To Fai Cheng (Cheng), Jean Yuen (Yuen), and K. David Sharma (Sharma).

¶ 2 Cheng, Yuen and Sharma, as well as Sammy Lee Chun Wing (Wing), Peter Suen Suk Tak (Tak), and Guo Quan Zhang (Zhang), cross-appeal from the superior court's award of attorneys' fees to them, arguing they were entitled to a greater award.[2] In addition, all of those individuals, as well as two entities (Eastern Vanguard Forex Ltd. (EVFL) and Eastern Vanguard Group Limited (EVGL)) and two other individuals (Michael E. Cho (Cho) and Wing Ming Tam (Tam)),[3] cross-appeal from the court's determination that the Commission had jurisdiction to conduct an administrative hearing in this case. They assert that federal law preempts state regulation of the off-exchange foreign currency trading transactions at issue.

¶ 3 For the reasons discussed, we affirm the superior court's finding that the Commission had jurisdiction over this matter but reverse its determination that the Commission failed to establish the "control liability" of Cheng, Yuen, and Sharma and its award of attorneys' fees to Cheng, Yuen, and Sharma. Because Wing, Tak, and Zhang are entitled to their attorneys' fees incurred during the administrative proceedings as well as the superior court proceedings, we remand this matter for a recalculation of their fees.

1. Ariz.Rev.Stat. (A.R.S.) §§ 44–1801 to –2126 (1994 & Supp.1998).

2. The superior court awarded fees to Wing, Tak, and Zhang (along with Cheng, Yuen, and Sharma) because it also reversed the Commission's finding of control liability as to them. The Commission has not appealed from the court's finding of no control liability as to Wing, Tak, or Zhang, only from its finding of no control liability as to Cheng, Yuen, and Sharma.

3. The superior court affirmed the Commission's findings that EVFL, EVGL, Cho, and Tam were all liable for Arizona securities violations.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 4 In February 1998, the Securities Division of the Commission initiated an administrative proceeding against Forex Investment Services Corporation (FISC), EVFL, EVGL, Sharma, Wing, Tak, Cho, Cheng, Yuen, Tam, Zhang, James Simmons, Jr. (Simmons), and Tokyo International (Tokyo). The Commission asserted that FISC, EVFL, EVGL, Sharma, Simmons, Cho, Cheng, Yuen, Tam, and Tokyo had committed primary violations of the registration and anti-fraud provisions of the Arizona Securities Act, namely Arizona Revised Statutes (A.R.S.) sections 44–1841, –1842, and –1991 (1994 & Supp.1998).[4] The Commission further alleged that Cheng, Yuen, Tokyo, Tam, and Zhang were liable under A.R.S. § 44–1999 (Supp.1998)[5] as controlling persons of FISC, and that Sharma, EVGL, Wing, and Tak were liable under the same statute as controlling persons of EVFL.

¶ 5 The above individuals and entities promoted leveraged trading in the foreign exchange market (the "Forex" market) by individual investors or their representatives. FISC, an Arizona corporation, advertised for foreign currency traders and trained individuals as traders in foreign currency. Cheng and Yuen were officers, directors, and shareholders of FISC.

¶ 6 FISC customers opened accounts with EVFL, a British Virgin Islands foreign currency trading company whose primary trading office is in Macau, on China's Pacific Coast. EVFL is wholly-owned by EVGL, another British Virgin Islands company. Sharma was a director of EVFL until August 1, 1997. Wing and Tak were officers of EVGL.

¶ 7 Pursuant to a January 1, 1997 agreement, EVFL agreed to pay FISC $20,000 monthly plus $50 per "position closed" in exchange for FISC providing training and facilities for foreign currency traders. On that same date, Tokyo and FISC entered into an agreement whereby Tokyo agreed to provide management consulting services to FISC and handle settlement of FISC orders. Tokyo was a branch office of EVFL located in San Francisco. Zhang was an officer and director of Tokyo. The Tokyo–FISC agreement also placed Tam, Tokyo's general manager, in "charge of" FISC. Tam hired Cho as FISC's marketing manager—a position Cho held from January 1997 through October 1997. Simmons, initially a FISC trader, was FISC's assistant marketing manager from June 1997 through October 1997. After Cho left FISC, Tam promoted Simmons to the marketing manager position, which he held until December 18, 1997.

¶ 8 The Forex trading at issue involved buying or selling (on margin[6]) fixed amounts of four currencies—the German Mark, the Swiss Franc, the British Pound, and the Japanese Yen. Each currency lot was priced in United States dollars based on fluctuating currency exchange rates reported on the Interbank Network, a global communication network of international banks.

¶ 9 Investors opened EVFL trading accounts through FISC by paying at least $10,000 as "Guarantee Money" and executing an EVFL "Customer's Agreement" and other documents. FISC deposited investor funds into EVFL's California bank account as an "initial margin" to secure trading

**4.** Section 44–1841 pertains to the sale of unregistered securities, § 44–1842 governs transactions by unregistered dealers and salesmen, and § 44–1991 prohibits fraud in the purchase or sale of securities.

**5.** The relevant portion of § 44–1999 has been renumbered to § 44–1999(B). 2000 Ariz. Sess. Laws, Ch. 108, § 41. For ease of reference, we use the renumbered statute through the remainder of this opinion. Section 44–1999(B) imposes joint and several liability on a person who "controls" another person liable for either fraud in the purchase or sale of securities (§ 44–1991) or

the filing of misleading information with the Commission (§ 44–1992).

**6.** A customer who purchases securities may pay for the securities in full or may borrow part of the purchase price from his or her broker. If the customer borrows funds, the customer will open a margin account with the broker. The portion of the purchase price that the customer must deposit is called margin and is the customer's initial equity in the account. *See, e.g., Walston & Co. v. Miller,* 100 Ariz. 48, 52–53, 410 P.2d 658, 661 (1966)(describing relationship between customer and broker in margin transactions).

transactions, and sent copies of the customer agreements to EVFL. FISC and EVFL did not execute trades on an organized trading exchange. Rather, FISC provided leveraged foreign currency trading services to its customers by relaying investor buy or sell orders through the FISC and Tokyo offices to the EVFL office in Macau. Currency dealers in Macau contracted directly with international monetary companies.

¶ 10 In the administrative proceeding, the Commission concluded that the leveraged foreign currency accounts offered by EVFL through FISC were "securities" within the meaning of the Securities Act, and that they were neither registered nor exempt from registration under the Securities Act. The Commission further concluded that FISC, EVFL, Simmons, and Cho had offered or sold these unregistered securities within or from Arizona and that they had offered or sold them while not registered as dealers or salesmen in violation of §§ 44–1841 and – 1842. The Commission determined that in connection with the offer and sales of such securities, FISC, EVFL, Simmons, and Cho also violated the anti-fraud provisions of § 44–1991. Specifically, the Commission determined that EVFL salespeople misled investors by giving false information of the business and investment experience of EVFL and FISC, the financial condition of EVFL, the various charges incurred by investors, and the risks attendant to Forex trades. This misleading information caused investors to sustain substantial losses. Nineteen of the twenty-one EVFL investor accounts opened through FISC sustained losses totaling $338,439.62. Accordingly, the Commission found these entities and the individuals involved primarily liable for violations of the registration and anti-fraud provisions of the Securities Act.

¶ 11 The agency further concluded that EVGL, Sharma, Wing, and Tak were liable as controlling persons of EVFL under § 44–1999. Finally, the Commission found Tokyo,

Cheng, Yuen, Tam, and Zhang liable as controlling persons of FISC under § 44–1999(B).

¶ 12 The Commission ordered the various entities and individuals to cease and desist from further securities violations. It also held FISC and EVFL jointly and severally liable with controlling persons Cheng, Yuen, Tokyo, Tam, Zhang, Sharma, EVGL, Wing, and Tak, and ordered them to pay $336,086.41 in restitution to various investors. *See* Arizona Administrative Code Regulation 14–4–308 (giving the Commission authority to require restitution). The Commission further ordered Simmons and Cho to pay additional restitution to various clients. Finally, the Commission imposed administrative penalties as follows—FISC and EVFL to pay $150,000 each; Sharma, Cho, Cheng, Yuen, Tokyo, and Tam to pay $100,000 each; and Simmons to pay $25,000.

¶ 13 EVFL, EVGL, Sharma, Wing, Tak, Cho, Cheng, Yuen, Tam, and Zhang appealed the ACC's decision to the Maricopa County Superior Court.[7] Following briefing by the parties, the superior court found that the Commission had jurisdiction over the matter.[8] The court also upheld the ACC's findings and rulings, except for the finding of controlling person liability as to Cheng, Yuen, Sharma, Wing, Zhang, and Tak.

¶ 14 Pursuant to A.R.S. § 12–348(A)(2) and (I)(1) (Supp.2000), Sharma, Wing, Tak, Cheng, Yuen, and Zhang moved for their attorneys' fees and expenses incurred in both the administrative proceeding and the superior court action. They sought approximately $168,000 in fees and $18,000 in expenses. The Commission objected to this fee request, arguing that these individuals were not entitled to fees or, alternatively, were not entitled to the sums requested. The superior court awarded fees of $4,000 plus the costs of the lawsuit, deciding to only award fees and costs associated with the filing of the lawsuit, not those arising out of the administrative proceeding.

---

7. FISC, Simmons, and Tokyo did not participate in the superior court action.

8. The parties had argued in both the Commission proceeding and the superior court that federal

law preempted state regulation of alleged securities violations arising from off-exchange foreign currency transactions. The Cross–Appellants now raise this issue on appeal.

¶ 15 Sharma, et al., moved for reconsideration of their fee request and sought findings on the ruling regarding the fee issue. Meanwhile, the Commission moved for reconsideration on the control liability issue. The superior court denied both motions for reconsideration, and entered judgment in accord with its prior rulings.

¶ 16 The Commission then filed this appeal, challenging the superior court's determination that Cheng, Yuen, and Sharma were not liable as controlling persons under § 44–1999(B). EVFL, EVGL, Cho, Tam, Sharma, Yuen, and Cheng cross-appealed from the court's determination that the Commission had jurisdiction over this matter. Wing, Cheng, Yuen, Sharma, Tak, and Zhang also cross-appealed from the court's attorneys' fees and costs award. We have jurisdiction over this case pursuant to A.R.S. § 12–2101(B) (2003).

## ISSUES

### On Appeal

1. Did substantial evidence support the Commission's finding that Cheng, Yuen, and Sharma were presumptively liable, under § 44–1999(B), as controlling persons of a person or entity that violated the anti-fraud provisions of the Arizona Securities Act?

2. If Cheng, Yuen, and Sharma were controlling persons under § 44–1999(B), did they fall within the statute's good faith exception to controlling person liability?

### On Cross–Appeal

1. Did federal law preempt the Commission's authority to regulate the off-exchange foreign currency trading transactions at issue?

2. Did the superior court abuse its discretion in awarding only $4,000 in attor-

---

**9.** The CEA was amended again in 2000 by the Commodity Futures Modernization Act (CFMA). This amendment conferred jurisdiction on the Commodity Futures Trading Commission (CFTC) to regulate off-exchange foreign currency trading in certain circumstances. *See* 7 U.S.C.A. § 2(c)(2) (Supp.2003). However, the crucial

neys' fees to Cheng, Yuen, Sharma, Wing, Tak, and Zhang?

## DISCUSSION

### I. Jurisdiction.

■ ¶ 17 We address the cross-appeal challenge of ACC's jurisdiction first because it is potentially dispositive of this appeal. Cross–Appellants argue that the Commission lacked jurisdiction over this case because the 1974 "Treasury Amendment" to the Commodities Exchange Act (CEA), 7 U.S.C. § 2(ii) (1994), specifically precludes the regulation of off-exchange transactions in foreign currency, such as the transactions underlying this matter.[9]

■ ¶ 18 State law is preempted under the Supremacy Clause [10] in three instances: (1) express preemption—when Congress explicitly defines the extent to which an enactment preempts state law; (2) field or implied preemption—when state law regulates conduct in a field Congress intended the Federal Government to occupy exclusively; and (3) conflict preemption—when state law actually conflicts with federal law. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 (3d Cir.2001). The party claiming preemption "bears the burden of demonstrating that federal law preempts state law." *Green*, 245 F.3d at 230 (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). The exercise of federal supremacy is not to be lightly presumed. *New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). Rather, a claim of preemption must overcome the assumption that a federal law does not supersede the historic police powers of the states. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978).

---

portions of the 1974 amendment to the CEA were in effect at all relevant times during this matter.

**10.** U.S. Const., art. VI, cl. 2.

¶ 19 The determination of preemption involves interpretation of the federal statute at issue. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663–64, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Questions of statutory interpretation are questions of law that we review de novo. *Ariz. Health Care Cost Containment Sys. v. Carondelet Health Sys.,* 188 Ariz. 266, 269, 935 P.2d 844, 847 (App. 1996).

¶ 20 The Commission asserts that it has jurisdiction over this matter pursuant to the Arizona Securities Act. The Securities Act gives the Commission jurisdiction to administer and enforce its provisions, including the authority to regulate the offer and sale of securities in the form of commodity investment contracts. *See, e.g.,* A.R.S. §§ 44–1801(3), –1821, –1842, –1961, –1971, –1991, and –2032 (1994 & Supp.1998); *see State ex rel. Corbin v. Goodrich,* 151 Ariz. 118, 121–22, 726 P.2d 215, 218–19 (App.1986). A commodity includes "any foreign currency." A.R.S. § 44–1801(3).

¶ 21 Cross–Appellants do not contest the status of the foreign currency trading accounts as commodity investment contract securities within the meaning of the Securities Act. Rather, they argue that certain provisions of federal law preempt the Commission from exercising jurisdiction over these trading accounts. Specifically, they rely on the "Treasury Amendment" to the CEA (7 U.S.C. § 2(ii)).

¶ 22 The Treasury Amendment was enacted when the Commodity Futures Trading Commission Act of 1974 amended the CEA,[11] creating the Commodity Futures Trading Commission (CFTC) and defining its jurisdiction. *See* Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389 (1974). Section 2 of the statute [12] provides:

§ 2. Accounts, agreements, and transactions subject to jurisdiction of [CFTC]; relation to jurisdiction of Securities and Exchange Commission and Federal and State courts; excepted transactions

(i) The [CFTC] shall have exclusive jurisdiction, except to the extent otherwise provided in section 2a of this title, with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

(ii) *Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency,* security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, *unless such transactions involve the sale thereof for future delivery conducted on a board of trade.*

7 U.S.C. § 2 (emphasis added).

¶ 23 Cross–Appellants focus on § 2(ii)'s provision that "[n]othing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade." Because the foreign currency trades at issue were *not* executed on an organized trading exchange, Cross–Appellants argue they fall within this provision and

---

**11.** Commodity Exchange Act, 7 U.S.C. §§ 1–25.

**12.** The Treasury Amendment is embodied in section 2(ii).

therefore are exempt from both federal *and state* regulation. They rely on decisions of the United States Supreme Court and the Ninth Circuit Court of Appeals that have interpreted this language to prohibit regulation of off-exchange foreign currency trading, such as the foreign currency contracts involved here. *See Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 469–80, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997); *Commodity Futures Trading Comm'n v. Frankwell Bullion Ltd.,* 99 F.3d 299, 301–04 (9th Cir.1996). They also rely on the legislative history behind the Treasury Amendment, which indicated that the Treasury Department thought that foreign currency futures trading, other than on organized exchanges, should not be regulated by the CFTC because most futures trading in foreign currencies was conducted through an informal network of banks and dealers that was already adequately serving the needs of international business. S.Rep. No. 1131, 93d Cong., 2d Sess. 49–51 (1974), reprinted in 1974 U.S.C.C.A.N. 5843, 5887–89. The Treasury Department convinced Congress that new regulatory limits could adversely impact the usefulness and efficiency of the foreign exchange market for traders and investors. *Id.* at 51.

¶ 24 We reject Cross–Appellants' interpretation of the statute as preempting *state* regulation of the commodity-related securities at issue. Rather, we agree with the Commission that the CEA actually preserves state jurisdiction to regulate foreign currency-related securities.

¶ 25 The first sentence of § 2(i) grants the CFTC exclusive subject matter jurisdiction over commodity futures, options on futures, and certain "leverage" commodity transactions, thus displacing the jurisdiction of state agencies over transactions within its scope. *See* 1 Alan R. Bromberg & Lewis D. Lowen-

fels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 4.6(471) (2d ed.1996). But the second sentence of § 2(i) is a statutory savings clause. *Messer v. E.F. Hutton & Co.,* 847 F.2d 673, 675 (11th Cir. 1988); *see also* Bromberg & Lowenfels § 4.6(471). The savings clause specifies that, except for the preemptive CFTC jurisdiction "hereinabove provided, nothing contained in this section shall [ ] supersede or limit the jurisdiction at any time conferred on ... other regulatory authorities under the laws of ... any State" or "restrict ... such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(i). The plain meaning of the term "this section" is *all* of section 2, including subsections (i) and (ii).[13] This clause allows concurrent jurisdiction by the CFTC, the Securities and Exchange Commission (SEC), and state securities regulatory agencies over commodity-related securities that do not fall within the exclusive jurisdiction provision. Bromberg & Lowenfels § 4.6 (471–79); *see also Black v. Corp. Div.,* 54 Or.App. 432, 634 P.2d 1383, 1387 (1981) (commodity-related securities violations not under CFTC exclusive jurisdiction when not traded or executed in designated contract market and when the violation involved capital-raising activities).[14]

¶ 26 When Congress enacted the 1974 Act, the Arizona Securities Act was already regulating commodities transactions as securities in the form of a "commodity investment contract" or "commodity option contract." 1974 Ariz. Sess. Laws, Ch. 126, §§ 1, 6 (effective May 9, 1974). The "duties and responsibilities" the Securities Act confers on the Commission to enforce its provisions fall squarely within section 2(i)'s preservation of state regulatory jurisdiction.

---

**13.** Through this savings clause, Congress expressly subordinated § 2(ii) and its exempted transactions to the overriding preservation of subject matter jurisdiction conferred at any time by state laws on "other regulatory authorities" to carry out "their duties and responsibilities in accordance with such laws." Bromberg & Lowenfels § 4.6(700).

**14.** Under the 1974 Act, substantial portions of the commodities market remained outside CFTC exclusive jurisdiction, and outside of CEA regulation. For example, commodity forward contracts and commodity spot market contracts are not subject to the CEA. *See* 7 U.S.C. § 1a(11) (forward contracts excluded); *Bank Brussels Lambert, S.A. v. Intermetals Corp.,* 779 F.Supp. 741, 748–49 (S.D.N.Y.1991) (CEA regulates futures market and does not apply to spot market).

¶ 27 Finally, section 2(ii), on which Cross–Appellants rely, bars *CEA regulation* of transactions in the listed items unless they involve the sale of futures on a board of trade. The express language of the provision, however, does *not* preempt state regulation over such transactions. Similarly, the legislative history behind the provision discusses the inappropriateness of *adding* regulation to the foreign exchange market, and advocates against regulation by the *"new agency,"* i.e., the CFTC, because the Treasury Department believed the market was already operating efficiently under self-regulation and then-existing regulatory laws. S.Rep. No. 1131, 93d Cong., 2d Sess. 49–51 (1974), reprinted in 1974 U.S.C.C.A.N. 5843, 5887–89, n. 3 (emphasis added). As noted, when Congress enacted the 1974 Act, the Arizona Securities Act was already regulating commodities transactions as securities in the form of a "commodity investment contract" or "commodity option contract." The legislative history of the Treasury Amendment does not express any intent to eliminate state or other existing federal regulation of such transactions; it simply indicates a desire to avoid *adding* regulation by the CFTC.

¶ 28 The two federal cases on which Cross–Appellants primarily rely likewise do not support state preemption. The holdings of those cases are confined to the viability of CFTC regulation under the CEA; neither addresses state securities jurisdiction. The question presented in *Dunn* was "whether Congress has authorized the [CFTC] to regulate 'off-exchange' trading in options to buy or sell foreign currency." 519 U.S. at 466–67, 117 S.Ct. 913. The *Dunn* decision did not address anything beyond the narrow issue of CFTC jurisdiction over foreign currency options under the CEA, and decided only that the *CFTC* could not regulate the transactions at issue. *Id.*

¶ 29 In *Frankwell Bullion,* the Ninth Circuit determined only whether foreign currency transactions in the form of futures or spot trades "are exempted from CFTC jurisdiction" because they are not transactions involving sales on a board of trade within the meaning of the Treasury Amendment. 99 F.3d at 301. Again, the court addressed nothing beyond the narrow issue of CFTC jurisdiction.[15]

¶ 30 Further, while the holdings in *Dunn* and *Frankwell Bullion* addressed CFTC jurisdiction over foreign currency futures-related transactions, neither of these cases, nor any of the other federal cases discussed by the parties, has recognized a Treasury Amendment bar to foreign currency-related securities regulation, either federal or state.[16] To the contrary, the Eleventh Circuit has recently held that the SEC had jurisdiction under the CEA § 2(i) savings clause to regulate foreign currency options as securities. *SEC v. Unique Fin. Concepts, Inc.,* 196 F.3d 1195, 1202–03 (11th Cir.1999). The defendants in that case had claimed that the "exclusive jurisdiction" provision in § 2(i) divested the SEC of jurisdiction to regulate foreign currency options as securities because the options were commodity futures within the meaning of the CEA. *Id.* at 1202. The court determined that the savings clause actually preserved SEC authority over its traditional regulatory functions. *Id.* The savings clause in § 2(i) preserves state regulatory jurisdiction to the same extent as SEC jurisdiction.

**15.** The Commissioner of the California Department of Corporations (CDOC) initially was a co-plaintiff in the case, alleging violations of state law as well as the CEA. However, when the CEA claims were dismissed, the federal district court declined to assert supplemental jurisdiction over the state law claims and dismissed them without prejudice. *Commodity Futures Trading Com'n v. Frankwell Bullion,* 904 F.Supp. 1072, 1078–79 (N.D.Cal.1995). Thereafter, the CFTC alone appealed the summary judgment dismissing the CEA claims to the Ninth Circuit. 99 F.3d at 299–300. The CDOC was not an appellant, and the state law claims were never a part of, nor addressed in, the appellate proceedings.

**16.** Cross–Appellants reliance on *International Trading, Ltd. v. Bell,* 262 Ark. 244, 556 S.W.2d 420 (1977), for the proposition that courts have recognized that the jurisdiction of the CFTC is exclusive and that § 2(i) preempted state regulation of commodities transactions is misplaced. *Bell* dealt with transactions expressly placed within the exclusive jurisdiction of the CFTC under 7 U.S.C. § 2(i). *Id.* at 424–25. The foreign currency trades at issue here were not subject to exclusive CFTC jurisdiction; rather, they were exempted from CFTC jurisdiction under 7 U.S.C. § 2(ii).

*See Poncy v. Shearson Lehman Bros., Inc.,* 548 So.2d 1196, 1197 (Fla.App.1989) ("we do not believe [the CEA] supersedes the enforcement of [state] anti-fraud legislation in regard to commodities transactions").

¶ 31 The law interpreting the other instruments grouped with foreign currency in the Treasury Amendment [17] confirms that the Amendment was not intended to preempt Commission jurisdiction over Cross–Appellants' transactions. Those instruments have a lengthy history of federal and state regulation. For example, security warrants and rights have long been regulated by the federal Securities Act of 1933, 15 U.S.C. § 77b(1) (1994), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1994). *See, e.g., Kusner v. First Pennsylvania Corp.,* 531 F.2d 1234, 1237 (3d Cir.1976) (stock warrants). Similarly, "government securities" include United States Treasury Department obligations and other agency securities. 15 U.S.C. § 78c(a)(42). Although exempt from SEC regulation under the 1933 Act, direct Treasury debts are securities subject to anti-fraud regulation under the 1934 Act. *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (Treasury bonds); *First Nat'l Bank of Las Vegas, N.M. v. Russell's Estate,* 657 F.2d 668, 673 (5th Cir.1981) (Treasury notes); *Fisher v. Dean Witter Reynolds, Inc.,* 526 F.Supp. 558, 559 (E.D.Pa. 1981) (Treasury bills). In addition, mortgages with related notes and assignments have been deemed "securities" subject to the 1933 and 1934 Acts, as well as the Arizona Securities Act. *See Hall v. Sec. Planning Serv.,* 371 F.Supp. 7, 14 (D.Ariz.1974); *State v. Brewer,* 26 Ariz.App. 408, 415, 549 P.2d 188, 195 (1976). Even "transactions in ... resales of installment loan contracts" and "repurchase options" are subject to regulation under the 1933 and 1934 Acts when configured as securities. 15 U.S.C. § 77b(1) (1933 Act); 15 U.S.C. § 78c(a)(10) (1934 Act).

¶ 32 The accepted federal and state securities regulation of the other items listed in the Treasury Amendment supports the savings clause interpretation urged by the Commission and confirms that the Amendment was not intended to preempt Commission jurisdiction over the foreign currency transactions engaged in by Cross–Appellants. Congress could not intend arbitrarily to preempt all state regulation of "transactions" in just one of eight listed items.

¶ 33 Accordingly, we are not persuaded that the Treasury Amendment preempted state law. Rather, we conclude that it preserved the effect of state law despite federal commodities regulation.[18] The Commission had jurisdiction to consider this matter.

## II. The Standard For Control Person Liability.

¶ 34 The Commission appeals from the superior court's determination that Cheng, Yuen, and Sharma (collectively "Control Appellees") did not meet the definition of "controlling persons" liable for EVFL and FISC's primary fraud in the purchase or sale of securities. The court held that "[t]he record does not support a finding that these individuals were controlling persons pursuant to case law prerequisite."

¶ 35 In reviewing administrative agency decisions, we do not re-weigh the evidence; instead, we determine only whether there was substantial evidence to support the agency's decision. *Nutek Infor. Sys. v. Ariz. Corp. Comm'n,* 194 Ariz. 104, 107, ¶ 15, 977 P.2d 826, 829 (App.1998). Substantial evidence exists if either of two inconsistent factual conclusions are supported by the record. *DeGroot v. Ariz. Racing Comm'n,* 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App. 1984). If supported by substantial evidence,

17. Including security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments. 7 U.S.C. § 2(ii).

18. Cross–Appellants further argue that a 1983 amendment of the CEA, the "Open Season Provision" embodied in 7 U.S.C. § 16(e) (1994), does not overrule the Treasury Amendment's preemption of state securities regulation of the transactions at issue. Given that we have concluded that the Treasury Amendment did not preempt such claims in the first place, we need not address the effect of the Open Season Provision on such (non-existent) preemption.

we will uphold an administrative decision unless the administrative agency acted illegally, arbitrarily, capriciously, or abused its discretion. A.R.S. § 12–910(E) (2003); *Nutek Infor. Sys.*, 194 Ariz. at 107–08, ¶ 15, 977 P.2d at 829–30. Further, even though we resolve questions of law involving statutory construction de novo, we give great deference to the agency's interpretation and application of the statute. *Better Homes Constr., Inc. v. Goldwater*, 203 Ariz. 295, 299, ¶ 15, 53 P.3d 1139, 1143 (App.2002); *Berenter v. Gallinger*, 173 Ariz. 75, 77, 839 P.2d 1120, 1122 (App.1992).

 ¶ 36 The Arizona Securities Act attaches vicarious, or secondary, liability to "controlling persons" to the same extent as it does to a person or entity that commits a primary violation of §§ 44–1991 or –1992:

> Every person who, directly or indirectly, controls any person liable for a violation of §§ 44–1991 or 44–1992 shall be liable jointly and severally with and to the same extent as the controlled person to any person to whom the controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act underlying the action.

A.R.S. § 44–1999(B). Although there are no Arizona cases interpreting this statute, we find interpretive guidance in the legislature's direction that the Arizona Securities Act be liberally construed to effect its remedial purpose of protecting the public interest:

> The intent and purpose of this Act is for the protection of the public, the preservation of fair and equitable business practices, the suppression of fraudulent or deceptive practices in the sale or purchase of securities, and the prosecution of persons engaged in fraudulent or deceptive practices in the sale or purchase of securities. This Act shall not be given a narrow or restricted interpretation or construction, but shall be liberally construed as a remedial measure in order not to defeat the purpose thereof.

1951 Ariz. Sess. Laws, ch. 18, § 20. More particularly, when the Arizona legislature enacted § 44–1999 as part of a series of amendments to title 44, chapter 12, it included the following statement of legislative intent:

> It is the intent of the legislature that in construing the provisions of title 44, chapter 12, Arizona Revised Statutes, the courts may use as a guide the interpretations given by the securities and exchange commission and the federal or other courts in construing substantially similar provisions in the federal securities laws of the United States.

1996 Ariz. Sess. Laws, ch. 198, § 11(C). Section 44–1999(B) is substantially similar to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Therefore, we may look to federal court decisions for interpretive guidance, *see also Nutek Infor. Sys.*, 194 Ariz. at 108, ¶ 16, 977 P.2d at 830; *Vairo v. Clayden*, 153 Ariz. 13, 17, 734 P.2d 110, 114 (App.1987), but are not bound even by the United States Supreme Court's interpretation of analogous federal securities laws, *Siporin v. Carrington*, 200 Ariz. 97, 103, ¶ 28, 23 P.3d 92, 98 (App.2001) ("We will depart from those federal decisions that do not advance the Arizona policy of protecting the public from unscrupulous investment promoters.").

¶ 37 The modern era of securities regulation began when the United States Congress, reacting to the 1929 stock market crash and to reports of widespread abuses in the securities industry,[19] enacted the Securities Act of 1933 and the Securities Exchange Act of 1934. These Acts, along with other companion congressional enactments, embrace a "fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

¶ 38 Section 20(a) was modeled after the controlling person provision of § 15 of the Securities Act of 1933, 15 U.S.C. § 77o; each of these provisions were "intended 'to pre-

---

**19.** Of the nearly fifty billion dollars worth of securities sold in the United States between 1920 and 1933, one half were worthless by 1933. Loftus C. Carson, II, *The Liability of Controlling Persons under the Federal Securities Act*, 72 Notre Dame L.Rev. 263, 268 n. 15 (1997) (citing 1 Louis Loss & Joel Seligman, *The Fundamentals of Securities Regulation* 169 (3d ed.1995)).

vent evasion' of the law 'by organizing dummies who will undertake the actual things forbidden.'" *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir.1990) (quoting *Stock Exchange Practices: Hearings on S. Res. 84 (72d Cong.) and S. Res. 56 and S. Res. 97 (73d Cong.) Before the Senate Comm. On Banking and Currency*, 73d Cong., 1st Sess. 6571 (1934) (statement of Thomas G. Corcoran, in the office of counsel for the Reconstruction Finance Corporation and one of the drafters of the Securities Act of 1934)). Before the passage of these Acts, controlling persons, including controlling shareholders and corporate officers, were essentially immune from traditional liability principles because the direct participation necessary to sustain a claim for a primary violation could be easily avoided or disguised by many persons with control. Loftus C. Carson, II, *The Liability of Controlling Persons under the Federal Securities Act*, 72 Notre Dame L.Rev. 263, 268–69 (1997). Additionally,

> [W]here, as frequently would be the case, the primary Securities Acts violators were corporations, ... the separate-legal-person status of corporations would have provided an impenetrable shield from liability ... on the ground that any violations of securities laws were committed by the corporation. Further, ... the conduct of a corporation's agents violative of securities laws could not have been attributed to those who were part of the formal organizational hierarchy—shareholders, directors, and dominant officers—on the basis of agency, because the principal in the agency relationship would have been the corporation.

Carson, 72 Notre Dame L.Rev. at 269–70 (footnotes omitted).[20]

¶ 39 Control Appellees claim that their mere status as controlling shareholders and officers or directors of the corporate primary violators was insufficient to establish their liability as controlling persons. *See, e.g., Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.1994) (director status is a "red light" but a director is not automatically liable as a

controlling person). Instead, according to Control Appellees, a person cannot be held liable as a controlling person pursuant to § 44–1999(B) unless the targeted person (1) *actually* exercised control over the primary violator(s); and (2) possessed the power to control the activity upon which the primary violation was predicated. *See Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985). Satisfaction of this test requires "scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan*, 49 F.3d at 1382.

¶ 40 Some Ninth Circuit cases, applying this or a similar standard, have found that controlling person liability was not established when the defendant was not shown to have participated in some manner in the actual violation. *See, e.g., Paracor Finance, Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir.1996) (CEO not liable for alleged affirmative misrepresentations and failure to disclose material facts about company's sales because investors' evidence of CEO's involvement in misrepresentations was virtually nonexistent); *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984) (director who was not involved in the preparation of the prospectuses at issue). Relying on these and similar cases, Control Appellees contend that they cannot be held liable as controlling persons because no evidence was presented that they actually participated in any violation of § 44–1991(A) by directing anyone to make false and misleading statements. *But see Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1067 (9th Cir.2000) (plaintiff need not prove actual participation to establish prima facie case under § 20(a)).

¶ 41 As did the Commission, we reject the "actual participation" requirement as "too restrictive to guard the public interest as directed by our state legislature." Arizona Corporation Commission Opinion and Order, Decision Number 62403 at 11–12 (Docketed Mar. 31, 2000) (Docket No. S–03177A–98–0000). First, § 44–1999(B) imposes presumptive liability for "[e]very person who,

**20.** *See* William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L.J. 171, 174 (1933) ("Satisfaction of the common-law requirements of fraud raised almost insurmountable barriers to recovery" before enactment of the 1933 Act.).

directly or indirectly, controls any person liable for a violation of §§ 44–1991 or 44–1992. . . ." The plain language of the statute does not support a requirement that a "controlling person" must have actually participated in the specific action upon which the securities violation is based. Indeed, the SEC has long defined "control" as meaning "the possession, direct or indirect, of the *power to direct or cause the direction of the management and policies of a person,* whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1995) (emphasis added). The SEC's broad definition is consistent with legislative history leading to the passage of § 20(a). "In this section . . . when reference is made to 'control,' the term is intended to include actual control as well as what has been called legally enforceable control." H.R.Rep. No. 73–1383, at 26 (1934).[21] *See G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981) ("Neither this definition [the SEC regulation] nor the statute [§ 20(a) ] appears to require participation in the wrongful transaction."); *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967) (Section 20(a) "has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."). Second, interpreting § 44–1999(B) to require "actual participation" in the underlying conduct would frustrate the intent behind the creation of controlling person liability: to impose accountability on those actors who had the authority to control primary violators but were not legally liable under extant legal principles. *Supra* ¶ 38; Carson, 72 Notre Dame L.Rev. at 300 ("[I]f participation was required, a person using strawmen, shell corporations, 'dummies,' and other proxies could immunize themselves [sic] from liability much the way they did prior to the enactment of the controlling persons provisions. Such an outcome would

contravene what Congress hoped to accomplish with section 20(a).").

¶ 42 Instead, in accordance with its remedial purpose, we interpret § 44–1999(B) as imposing presumptive control liability on those persons who have the *power* to directly or indirectly control the activities of those persons or entities liable as primary violators of §§ 44–1991 and –1992. *Cf. G.A. Thompson,* 636 F.2d at 958 (concluding that minority stockholder who was also officer and director "had the requisite power to directly or indirectly control or influence corporate policy"). Thus, to satisfy the first prong of § 44–1999(B), the evidence need only show that the person targeted as a controlling person had the legal power, either individually or as part of a control group, to control the activities of the primary violator.

### III. The Commission Established That Cheng, Yuen, And Sharma Met The Definition Of Controlling Persons Under The Statute.

#### 1. *Cheng and Yuen.*

█ ¶ 43 The Commission found Cheng and Yuen liable as controlling persons of FISC.[22] As its sole shareholders, Cheng and Yuen each held half the stock in FISC and invested $100,000 in start-up costs in 1995. Cheng was the president of FISC and Yuen was secretary/treasurer; they were its only directors.[23] Although Cheng and Yuen hired Tam to manage FISC, they consulted Tam on major decisions, including the hiring and terminating of personnel and executing major business decisions. Also, Cheng & Yuen closely tracked FISC's progress. Finally, nearly all of FISC's operating expenses in 1996 were funded by "loans" made to it by Cheng and Yuen's husband. These loans, totaling approximately $145,000, which were

---

**21.** *See* A.R.S. § 10–801(B) (Supp.2002), which generally requires that "[a]ll corporate powers shall be exercised by or under the authority of and the business and affairs of the corporation shall be managed under the direction of its board of directors . . . ."

**22.** The Commission assessed primary liability against FISC for securities fraud, and found Tam liable as a controlling person of FISC.

**23.** During the relevant time frame, Cheng was also the executive director of EVGL, the parent company of EVFL, was one of two directors for EVFL, and served as its corporate secretary. He also effectively held half-ownership of Tokyo, the firm that provided management consulting services to FISC.

made on an almost monthly basis, support a finding that Cheng and Yuen were consistently involved in FISC's management and its financial operations.

¶ 44 Cheng and Yuen nonetheless argue that they cannot be held liable as "control persons" pursuant to § 44–1999(B) because the evidence did not demonstrate that Cheng and Yuen actively participated in FISC's formation, played any role in its day-to-day operations, created its training program, instructed traders regarding how to obtain clients, supervised any trades, or had any knowledge or notice of the misrepresentations made to investors. However, based on their status as sole shareholders and officers and directors of FISC, and given our determination that control liability may be premised on the power to control and does not require actual participation in the wrongful conduct, the Commission's finding that Cheng and Yuen were control persons is supported by the evidence.

*2. Sharma.*

¶ 45 The Commission also found that Sharma was a controlling person of EVFL.[24] From August 9, 1994 until August 1, 1997, Sharma was the only director and sole shareholder of EVFL. Sharma and Tak (deputy chairman and secretary of EVGL) were co-signers on all of EVFL's bank accounts, and investors could not withdraw funds from their EVFL trading accounts unless both Sharma and Tak signed written authorization to EVFL's California bank. Sharma also actively participated in setting up customer agreements with several investors. Sharma's status as a controlling person of EVFL was lent further evidentiary support when EVFL and EVGL failed to comply with an order by the Commission that they produce records concerning Sharma's compensation from EVFL. Under these circumstances, we conclude that the Commission's determination that Sharma was a controlling person of

EVFL was supported by substantial evidence.

## IV. Neither Cheng, Yuen, Nor Sharma Proved § 44–1999(B)'s Affirmative Defense.

¶ 46 Although § 44–1999(B) renders a controlling person presumptively liable when a controlled person violates either § 44–1991 or § 44–1992, a defense is provided to a controlling person who "acted in good faith and did not directly or indirectly induce the act underlying the action." The burden of proof falls on the controlling person. *Hollinger,* 914 F.2d at 1575 (Section 20(a) "premises liability solely on the control relationship, subject to the good faith defense.").

¶ 47 Cheng, Yuen, and Sharma assert that they each satisfied the requirements of the affirmative defense because they lacked "scienter"[25] and no evidence was presented that they actively participated in any wrongful conduct. *See Howard,* 228 F.3d at 1065 ("a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation"). We disagree.

¶ 48 To prevail using this defense, the controlling person must demonstrate both good faith and lack of inducement. Hence, the defense is unavailable to a person who induces a fraud while possessing a good-faith belief that he or she was not perpetrating a fraud. *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1434 (9th Cir.1995). Likewise, mere nonparticipation in the actual fraudulent act is insufficient to establish good faith. *Id.* Otherwise, controlling persons could avoid liability by disregarding their duty to monitor the activities of the controlled person:

> If ... a person could avoid liability under section 20(a) merely by demonstrating the absence of culpable participation and a lack of actual knowledge of Exchange Act violations, the purposes of congres-

---

24. The Commission found EVFL liable as a primary violator, and found EVGL liable as a controlling person of EVFL.

25. In the context of a civil lawsuit for damages involving alleged violations of the Securities Ex-

change Act of 1934 and Rule 10b–5, "scienter" refers to a state of mind embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

sional enactment would be frustrated. . . . If liability under section 20(a) could be premised only on culpable participation or actual knowledge, the less involved the controlling person was in the controlled person's activities, the easier it would be to establish a successful defense under section 20(a) . . . [and] controlling persons would be encouraged to be derelict with regard to their duties in order to remain ignorant of possible Exchange Act violations by their controlled persons.

Carson, 72 Notre Dame L.Rev. at 305–06. Thus, even if we assume that evidence was lacking to demonstrate their actual involvement in a specific violation, Control Appellees are not therefore absolved from liability. Rather, the appropriate standard must be flexible enough to include acts of omission as well as commission.

¶ 49 For similar reasons, we believe evidence demonstrating a lack of scienter is not sufficient to prove the good faith prong of the affirmative defense. Section 44–1991(2), unlike its federal counterpart, § 10(b) of the 1934 Act and Rule 10b–5, has no scienter requirement for civil lawsuits. *See State v. Gunnison,* 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980). Clearly, it would be anomalous to shield controlling persons from liability because of a perceived lack of intent when guilty knowledge need not be shown as to noncontrolling persons. *See G.A. Thompson,* 636 F.2d at 960 ("[H]ad Congress meant to require intentional misdoing, we assume it would have done so explicitly.").

¶ 50 We are cognizant that the United States Supreme Court has alluded to § 20(a) as an example of a provision of the 1934 Act that "contains a state-of-mind condition requiring something more than negligence." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n. 28, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). However, the legislative directive that Arizona's securities laws be interpreted liberally to protect the investing public requires that controlling persons not be allowed to avoid liability for security violations merely by proving lack of involvement with, or knowledge of, the specific violation(s). This is particularly so in the present case in which the sole activity of FISC and EVFL

was their fraudulent offer and sale of commodity investment contracts in the form of leveraged foreign currency trading accounts. At the minimum, in order to establish an affirmative defense in a case involving nonfeasance, controlling persons must establish that they exercised due care by taking reasonable steps to "maintain and enforce a reasonable and proper system of supervision and internal control[s]." *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1473 (2nd Cir.1996) (quoting *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 716 (2d Cir.)).

¶ 51 Control Appellees assert that their good faith was demonstrated by a requirement that all traders attended a two-month training program designed to "explain foreign currency training to its traders, to highlight the risks involved, and to ensure that traders did not make any misstatements to potential customers." The Commission, however, found that the training program was primarily designed to develop traders who would bring in new accounts rather than ensure that traders were adequately trained to comply with securities laws. More importantly, even assuming that the program was a good-faith "training" effort, it would not constitute an ongoing system of appropriate supervision and internal controls. The Commission's determination that Control Appellees failed to prove § 44–1999(B)'s good faith and lack of inducement defense was supported by substantial evidence. Accordingly, we uphold the Commission's decision imposing controlling person liability on Cheng, Yuen, and Sharma.

## V. The Attorneys' Fees Award.

¶ 52 On Cross–Appeal, Cheng, Yuen, Sharma, Wing, Tak, and Zhang argue that the superior court abused its discretion in awarding them only $4,000 in attorneys' fees. Because Cheng, Yuen, and Sharma are liable as control persons, they are not entitled to any attorneys' fees and we necessarily reverse the award of attorneys' fees as to them.

¶ 53 As to Wing, Tak, and Zhang (the "Fee Cross Appellants"), the superior court expressly limited the award of fees to those incurred in the superior court action and did not award any fees in connection

with the underlying administrative proceeding.

¶ 54 The Fee Cross–Appellants based their fee request on § 12–348(A)(2), which provides in relevant part:

A. In addition to any costs which are awarded as prescribed by statute, a court shall award fees and other expenses to any party other than this state or a city, town or county which prevails by an adjudication on the merits in any of the following:

. . . .

2. A court proceeding to review a state agency decision pursuant to chapter 7, article 6 of this title [section 12–901 et seq.] or any other statute authorizing judicial review of agency decisions.

We review the court's award of attorneys' fees under that statute for an abuse of discretion. *SDC Mgmt., Inc. v. State ex rel. Ariz. Dep't of Revenue*, 167 Ariz. 491, 500, 808 P.2d 1243, 1252 (App.1991).

¶ 55 The Fee Cross–Appellants assert the superior court abused its discretion in only awarding them fees in connection with the judicial action. They contend that the award of fees to which they were entitled as the prevailing party includes fees incurred in the administrative proceeding pursuant to § 12–348(I)(1), which specifically defines fees and expenses to include "in the case of an action to review an agency decision pursuant to subsection A, paragraph 2 of this section, all fees and other expenses that are incurred in the contested case proceedings in which the decision was rendered." Because fee awards under this provision are mandatory, *Mountain States Tel. & Tel. Co. v. Corp. Comm'n*, 160 Ariz. 350, 360–61, 773 P.2d 455, 465–66 (1989), the Fee Cross–Appellants urge that the superior court was required to award them the fees and expenses incurred during both the trial and administrative proceedings.

¶ 56 The Commission responds that *Mountain States* is no longer controlling and that § 12–348(A)(2) no longer mandates an award of fees incurred during the administrative hearing. Apparently, the Commission reads A.R.S. § 41–1007 (2003), which generally mandates an award of attorneys' fees against state agencies in administrative proceedings in which the agency's position was not "substantially justified," § 41–1007(A)(1), as superseding the above-quoted portion of § 12–348(I)(1). The Commission cites *City of Phoenix v. Paper Distrib. of Ariz.*, 186 Ariz. 564, 925 P.2d 705 (App.1996) as supporting this outcome.

¶ 57 *Paper Distributors* involved an award of fees under § 12–348(B) in a tax case. 186 Ariz. at 565, 925 P.2d at 706. In that case, we noted that the legislature adopted a series of amendments to § 12–348 in 1990 that changed the award of fees and expenses in tax cases from mandatory to discretionary. *Id.* at 566, 925 P.2d at 707; *see* 1990 Laws Ch. 360, § 1. In rejecting the taxpayer's argument that an award of fees under § 12–348(B) may properly include legal fees incurred in the underlying administrative proceeding, we held that such an award of fees is permitted by § 12–348 *only* when the action to review the contested administrative proceedings is brought under subsection (A)(2). *Paper Distributors*, 186 Ariz. at 567–68, 925 P.2d at 708–09. Thus, rather than supporting the Commission's argument, *Paper Distributors* supports the proposition that the Fee Cross–Appellants are entitled to an award of legal fees incurred during the administrative proceedings.

¶ 58 Further, given the express language in § 12–348(I)(1), we are not persuaded that when the legislature added A.R.S. § 12–348.01, the predecessor to § 41–1007, *see* Laws 1994, Ch. 281, § 1, it intended to limit the recovery of fees pursuant to § 12–348(A)(2). Rather, § 41–1007 mandates an award of attorneys' fees for administrative proceedings in certain situations to parties who otherwise would not qualify for them pursuant to § 12–348. Accordingly, we conclude that the superior court erroneously restricted the Fee Cross–Appellants' award of fees to those incurred in the court proceedings.

¶ 59 The Commission next asserts that any fee award is improper because the Fee Cross–Appellants did not "prevail[ ] by an adjudication on the merits" as required by § 12–348(A). In the administrative matter, the Commission concluded that the Fee

Cross–Appellants were "controlling persons" under § 44–1999(B) and that they violated the anti-fraud provisions of the Arizona Securities Act, and ordered them to cease and desist from future violations of the Act and to pay restitution and administrative penalties. The superior court concluded that the Commission had not established "control liability" on the part of the Fee Cross–Appellants—a finding not disputed by the Commission on appeal—and vacated that part of the Commission Order. Thus, because they prevailed on their legal argument and were absolved of any liability, the Fee Cross–Appellants clearly prevailed on the merits. *Mountain States*, 160 Ariz. at 360, 773 P.2d at 465 (party who obtains relief from agency decision deemed prevailing party); *Columbia Parcar Corp. v. Ariz. Dep't of Transp.*, 193 Ariz. 181, 183, ¶ 15, 971 P.2d 1042, 1044 (App.1999) (prevailing on the merits for purposes of § 12–348 means that judgment was based on legal rights, not just mere matters of practice, jurisdiction, or form).

■ ¶ 60 Finally, the Commission asserts that even if the Fee Cross–Appellants are prevailing parties entitled to their fees including the fees arising from the administrative proceedings, they are not entitled to *all* the fees they requested. Specifically, the Commission asserts that the Fee Cross–Appellants may not recover fees related to legal work done for their co-respondents who either failed to appeal the Commission Order or who failed to prevail in the superior court action. For example, according to the Commission, they would not be entitled to fees incurred by EVGL at either the administrative or superior court levels because it did not prevail on the challenge to its control liability. Further, the Commission asserts that the Fee Cross–Appellants are not entitled to fees arising out of defenses on which they did not prevail, such as their argument in the administrative proceeding that the investments at issue were not "securities," or their argument at both the administrative and superior court levels that the Commission lacked jurisdiction over this case due to federal preemption.

¶ 61 The Fee Cross–Appellants respond that all these fees are mandated by § 12–348,

and claim that our supreme court held in *Mountain States* that the superior court lacked discretion to reduce fees. 160 Ariz. at 360, 773 P.2d at 465. The decision in *Mountain States*, however, appears to have involved parties that had clearly prevailed against the Commission on all the relief sought. *Id.* There was no apportionment issue raised regarding fees sought by prevailing and non-prevailing parties or for both successful and unsuccessful claims. *Mountain States* therefore does not control our resolution of this issue.

¶ 62 Section 12–348 is modeled on the Equal Access to Justice Act (28 U.S.C. § 2412 (1994)). *See Estate of Walton*, 164 Ariz. 498, 500, 794 P.2d 131, 133 (1990). Federal cases interpreting the Act support the conclusion that a party who is successful on fewer than all claims may recover only the fees attributable to the claim(s) on which that party prevailed. *See, e.g., Hanrahan v. Hampton*, 446 U.S. 754, 757–58, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Johnson v. Sec'y of/and U.S. Dep't of Housing & Urban Dev.*, 594 F.Supp. 265, 267 (E.D.La.1984). Such an interpretation is buttressed by the plain language of § 12–348(A)(2) allowing fees where a party has "prevail[ed] by an adjudication on the merits...." Clearly, the intent of the statute is to reimburse fees to successful parties for their successful claims or defenses. *Id.* Accordingly, we conclude that the Fee Cross–Appellants are not entitled to recover the fees and expenses incurred solely in connection with unsuccessful claims or on behalf of non-prevailing parties. Therefore, on remand, Wing, Tak, and Zhang should submit a fee request that seeks solely the fees arising from their successful defense of the control liability issue.

¶ 63 The Fee Cross–Appellants also assert that they are entitled to fees greater than the presumptive maximum of $75 per hour allowed under the statute. Section 12–348(E)(2) states that an award of attorneys' fees pursuant to subsection (A) shall not exceed $75 per hour unless "the court determines that an increase in the cost of living or a special factor, such as a limited availability of qualified attorneys for the proceeding involved, justifies a higher fee." The Fee

Cross–Appellants argue that the superior court abused its discretion in not authorizing a higher fee award in this case because an increased fee was justified both by an increase in cost of living *and* the limited number of attorneys experienced in the area of securities regulation before the Commission.

¶ 64 It is unclear if or how the superior court ruled on this issue. As the Fee Cross–Appellants themselves recognize, although the court awarded $4,000 in fees for the superior court proceedings, it never expressly ruled on the fee adjustment issue nor provided any explanation of its award. Accordingly, in our remand of the fee issue to the superior court, we direct it to exercise its discretion on the fee adjustment issue. *See Arizona Water Co. v. Arizona Dep't of Water Res.*, 205 Ariz. 532, 539–41, ¶¶ 32–44, 73 P.3d 1267, 1274–76 (App.2003).

### CONCLUSION

¶ 65 For the reasons discussed, we affirm the superior court's finding that the Commission had jurisdiction over this matter. Because we conclude that adequate evidence supported the Commission's imposition of control liability as to Cheng, Yuen, and Sharma, we reverse the superior court's holding to the contrary. We also conclude that Wing, Tak, and Zhang are entitled to recover the fees incurred in the administrative proceedings as well as the fees incurred in the superior court proceedings. Therefore, we vacate the superior court's fee award and remand the fee issue with a direction that the superior court award Wing, Tak, and Zhang the fees and expenses incurred in both the administrative and court proceedings arising from the claims on which Wing, Tak, and Zhang prevailed. We further direct the superior court to consider whether an upward fee adjustment from the presumptive $75 per hour maximum is appropriate in light of either an increase in the cost of living and/or the limited availability of qualified attorneys for the proceedings involved.

¶ 66 The Appellees and Cross–Appellants seek their fees and costs incurred on appeal and cross-appeal pursuant to § 12–348(A)(2). Cross–Appellants EVFL, EVGL, Cheng, Yuen, Sharma, Cho, and Tam failed to prevail on appeal. Therefore, they are not entitled to an award of fees. We award the Fee Cross–Appellants—Wing, Tak, and Zhang—their attorneys' fees and costs on appeal in an amount to be determined following their compliance with Arizona Rule of Civil Appellate Procedure 21(a).

CONCURRING: JOHN C. GEMMILL, Judge, and EDWARD C. VOSS, Judge.