500 P.2d 906

**EAST CAMELBACK HOMEOWNERS ASSOCIATION, an Arizona corporation; and Jerry Hirshberg, Appellants,**

**v.**

**ARIZONA FOUNDATION FOR NEUROLOGY AND PSYCHIATRY, an Arizona corporation, dba Camelback Hospital, et al., Appellees.**

**No. 1 CA–CIV 1145.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 12, 1972.

Dushoff, Sacks & Corcoran, by Jay Dushoff, Phoenix, for appellants.

Burch, Cracchiolo, Levie, Guyer & Weyl, by Joseph L. Moore, Frank Haze Burch, Phoenix, for appellees.

JACOBSON, Judge.

This appeal seeks a determination as to whether a zoning board of adjustment properly allowed the expansion of a non-conforming use and whether a superior court can modify the conditions of that expansion.

In this much-litigated dispute between a privately-owned mental hospital and the owners of surrounding property, we are dealing with the second appeal of an attempt by the appellees Arizona Foundation for Neurology and Psychiatry and the Phoenix Institute of Neurology and Psychiatry, owners of Camelback Hospital (hereinafter collectively referred to as Camelback), to obtain permission to expand and remodel its hospital facility located at 5055 N. 34th Street, Phoenix, Arizona.

This litigation first began in 1966 when Camelback filed an appeal with the appellee Board of Adjustment I (Board) seeking a determination as to whether it had to obtain a use permit for the expansion and remodeling of its hospital as required by the City of Phoenix building inspector. The Board held that a use permit was not required. As a result of that decision two lawsuits were filed in superior court, one by the building inspector and one by the appellants, East Camelback Homeowners Association and Jerry Hirshberg (Homeowners)[1]. Because of a decision by the Board to reconsider its position, these lawsuits were dismissed. Subsequently, the Board again determined that Camelback was not required to obtain a use permit for the desired construction. Again, a second round of lawsuits ensued, culminating in a decision by the Court of Appeals (Arizona Foundation for Neurology and Psychiatry v. Sienerth, 13 Ariz.App. 472, 477 P.2d 758 (1970) ) affirming the trial court's determination that the applicable City of Phoenix zoning ordinance required the obtaining of a use permit.

There then followed the proceedings which give rise to the present appeal. Pursuant to the Court of Appeals decision,

1. East Camelback Homeowners Association consists of property owners surrounding and in the vicinity of Camelback Hospital. Appellant Jerry Hirshberg is a member and officer of this association and also lives in the vicinity of Camelback Hospital.

Camelback filed with the Board an appeal from the denial by the building inspector of a use permit for the proposed construction of the hospital. After a hearing, the Board granted the application for the use permit subject to certain conditions, among which were that the hospital could not expand its bed capacity beyond the present 89 beds, that no out-patient or emergency services would be permitted, that parking would be limited to a minimum of 186 parking spaces and that construction would be restricted to the plans and specifications submitted to the Board. The Homeowners sought review in superior court of this ruling pursuant to A.R.S. § 9–465, subsec. E, which review resulted in the affirmance of the granting of a use permit but modified the conditions attached thereto by providing, contrary to the Board's conditions, that four outpatients could be treated at the hospital on an average daily basis, that the number of patients treated by doctors in the professional building were exempted from the limitations on number of patients, and that parking spaces were fixed to the minimum number required by the City plus an additional 26 spaces. This last condition resulted in giving Camelback substantially less parking spaces than the 186 minimum set by the Board. The Homeowners have appealed this superior court judgment.

The background history discloses that the property on North 34th Street was originally purchased by appellees in 1954, at which time the property was located outside the corporate limits of the City of Phoenix. A use permit was granted by Maricopa County to operate a facility for mental patients at that location, limited to a patient load of 32. Between 1954 and 1966, when the predecessor of the present litigation commenced, the patient capacity at the hospital increased from 32 to 89. It appears that there was no official sanction for the patient load increase during these years. In 1958 the hospital area was annexed into the city and operates under an R–5 zoning designation while the surrounding area is zoned R–1.[2]

It was against this historical background that Camelback Hospital sought to increase the size of its facilities from 26,000 square feet to 56,000 square feet. The expansion would include the addition of a new occupational therapy wing, patient wing, administration wing and dining room. In addition, the plans called for an expansion of the pharmacy, EEG room, X-Ray department and clinical laboratory. It was the avowed purpose of Camelback that the new construction would not increase the patient load beyond the present 89, but would merely provide a more desirable facility to treat the existing patient load.

The hearing on Camelback's application for a use permit to allow this construction was commenced before the Board on November 22, 1967, at 7:00 p.m., at which hearing Homeowners were present and represented by counsel. Camelback's presentation to the Board lasted until 11:30 p.m., at which time counsel for Homeowners asked for a continuance of the hearing based partly on the lateness of the hour and partly on the contention that until Camelback's presentation was completed, Homeowners were not aware of the exact nature of the proposed expansion, and additional time was necessary to adequately prepare. This motion was denied, and Homeowners submitted numerous witnesses and documentary evidence showing basically the fears of the surrounding neighborhood to the unauthorized expansion of the patient load at the hospital based upon the past history of the facility. In addition, Homeowners presented testimony that the proposed construction would aggravate the problems of inadequate parking, traffic congestion, noise, aesthetics, patient disturbances and that it would adversely affect

2. The R–1 zoning restricts the area to single family residences while R–5 allows the operation of the type of facility conducted by Camelback.

the resale value of surrounding properties. The motion to continue was renewed at 12:30 a.m., was again denied, and the hearing concluded at 3:00 a.m. the next morning. The Homeowners also requested that the hearing be conducted before Board of Adjustment II, rather than Board I, because of alleged bias and prejudice of Board I arising out of the prior litigation. This request was also denied.

The Homeowners raise the following questions on appeal:

(1) Did Camelback prove the necessary jurisdictional facts to entitle it to a use permit?

(2) Was the public notice of hearing inadequate as a matter of law?

(3) Did the denial of Homeowners' motion to transfer the hearing to another board of adjustment operate to deny them due process of law?

(4) Did the denial of Homeowners' motion to continue the hearing deny them due process of law?

(5) Did the Board commit reversible error by refusing to place the witnesses under oath? and,

(6) Did the superior court have jurisdiction to modify the conditions imposed by the Board without a cross-petition by Camelback?

## JURISDICTIONAL FACTS

Homeowners base their attack as to the insufficiency of the jurisdictional facts before the Board upon § 109(B) of the Phoenix Zoning Ordinance (1967), which in pertinent part provides:

"The boards of adjustment shall have no power or jurisdiction to hear any matter except . . .

"3. To hear applications for and to grant . . . use permits where required by this ordinance upon a finding by the Board hearing, the application that the use covered by permit, the manner of conducting the same, and any building which is involved will not be detrimental to persons residing or working in the vicinity, to adjacent property, to the neigh-

borhood or the public welfare in general . . . . The burden of proof for satisfying the aforementioned requirements shall rest with the applicant . . . ."

The findings required by § 109 of the City of Phoenix Code have been held to be jurisdictional to the exercise of granting a use permit. Mueller v. City of Phoenix ex rel. Phoenix Board of Adjustment II, 102 Ariz. 575, 435 P.2d 472 (1967).

We note initially that a large portion of the Homeowners' briefs before this court deal with the past history of the expansion of the patient load of the hospital without official sanction. This history was fortified by the introduction of various applications for funds filed by Camelback with the Federal government and the structural designs of the proposed construction which indicate an intent to increase the patient capacity of the hospital. From this history and documentary evidence the Homeowners argue that the evidence reasonably supports the inference that the hospital will increase its patient load contrary to the express limitations as to the number of patients allowed at the facility. We assume that the Homeowners are forced to adopt such a position, otherwise their evidence that the proposed construction will increase parking problems, noise, traffic congestion, and patient disturbances is somewhat meaningless since these problems will occur only if the patient and staff load at the hospital is increased.

While the Homeowners, in view of the past history of this facility, cannot be faulted for being skeptical of the avowal by Camelback that patient and staff load would not be increased, the Board specifically conditioned the use of the facility, a condition the superior court concurred in, to a maximum of 89 beds. Moreover, the Board specifically provided that "any violation of this restriction shall render the Use Permit null and void." The superior court incorporated this restriction by finding that "[I]t is the express intention of the Board to put an end to the expansion of the hospital in the ex post facto manner

described in Exhibit 17." Supervision of the patient load is provided in both the Board's and the trial court's conditions by the use of reports required to be filed monthly by Camelback with the Board Superintendent of Building Inspections of the City of Phoenix. It thus appears to the court that adequate safeguards against the reoccurrence of the unsanctioned increase of patients has been provided for and if unauthorized increases should occur in the future, the Homeowners would have an adequate legal remedy. We therefore deem immaterial the evidence presented by Homeowners showing an increase in problems at the hospital which would have as their basis an increase in patient or staff load.

We turn now to the sufficiency of the evidence to justify the jurisdictional findings required by the Board. The scope of review by the superior court of a decision of a board of adjustment is by way of certiorari. A.R.S. § 9–465, subsec. E. To determine the sufficiency of the evidence to sustain a jurisdictional fact found to exist by an inferior board or tribunal where review is by certiorari, it is necessary to determine whether the order sought to be reviewed is "without any evidence to support it, or is absolutely contrary to the uncontradicted and unconflicting evidence upon which it purports to rest." Hunt v. Norton, 68 Ariz. 17, 198 P.2d 124, 128 (1948), Anno. 5 A.L.R.2d 668 (1949). Thus, if there is reasonable evidence before the Board which sustains the jurisdictional facts, the reviewing court will not substitute its decision for that of the Board. Mueller v. City of Phoenix, *supra*; Walker v. Dunham, 78 Ariz. 419, 281 P.2d 125 (1955).

Applying these principles to the facts of this case, it appears that Camelback has been operating at its present capacity at least since 1959. It further appears that at the present time 50% of the existing facility does not meet the current standards of the Arizona State Health Department and that the proposed expansion and remodeling is necessary to comply with these standards. Likewise, the inspector for the Arizona State Board of Pharmacy testified that the existing pharmacy is not in compliance with provisions of the State Board. Again, expansion or remodeling would be necessary to meet these provisions. A doctor who resides and practices in the area of the hospital testified that, in his opinion, the hospital was a benefit to the neighborhood. Other medical and psychiatric witnesses testified as to the need for the continued existence of the hospital facility, and that the services performed there were beneficial to the community at large. Also testimony was adduced to offset the complaints of neighbors concerning wanderings and escaped patients indicating that the proposed expansion offered better supervision and security of the patients. Moreover, the testimony showed that aesthetically the premises would be enhanced by the proposed construction.

In view of the rather severe limitations imposed upon increasing both staff and patients which answered the vast majority of the complaints of the Homeowners, and the purposes for which expansion and remodeling were desired, we cannot say as a matter of law that there was insufficient evidence to support the Board's findings that the proposed construction would not be detrimental to persons residing or working in the vicinity, to the adjacent property, to the neighborhood or to the public welfare in general.

## ADEQUACY OF NOTICE OF HEARING

Homeowners next contend that the Board lacked jurisdiction to consider Camelback's application for a use permit because of the inadequacy of the public notice of hearing. Homeowners' argument in this regard is directed to the reason given for the appeal which was stated as "use permit to enlarge or expand a lawfully established hospital." Homeowners then argue that they were unable to ascertain from the notice the exact extent or nature of the expansion and for all they knew "the hospital might have nothing further in mind than building a tool shed for their

gardener." Therefore, they were inadequately prepared to defend against the proposed expansion.

A.R.S. § 9–465, subsec. B provides in part that:

"The Board shall fix a reasonable time for hearing the appeal and give notice thereof to the parties in interest and the public."

This requirement of notice is made specific by § 109(C)(5) of the Phoenix Zoning Ordinance which provides:

"Appeals and applications shall be made on forms provided by the Boards through the PLANNING DEPARTMENT and shall specify, by allegation or allegations, the basis of the application or appeal."

■ The purpose of public notice of action by the Board is to give persons who may be affected reasonable warning that their property may be affected, and a notice is adequate if it affords an opportunity to any person, by the exercise of reasonable diligence, to determine if his property would be affected and to what extent. 2525 East Avenue, Inc. v. Town of Brighton, 33 Misc.2d 1029, 228 N.Y.S.2d 209 (1962). The notice in this case was on a form prepared by the boards of adjustment and on its face disclosed the location and the legal description of property for which a use permit was sought. It further advised that expansion and enlargement of the hospital was sought. On November 1, 1967, at which time counsel for Homeowners appeared before the Board to raise its motion of inadequacy, the Board had before it the specific plans and specifications Camelback sought to have approved by the use permit and counsel for Homeowners presented a witness, in support of another motion, who testified he had examined these plans and specifications. The actual evidentiary hearing before the Board did not take place until November 22, 1967. Moreover these same plans and specifications, with only minor variations, had been before the Board since 1966, when the first round of litigation in which Homeowners was a party was fought. Under these circumstances we find Homeowners' contention that the notice was inadequate to allow them to prepare is completely without merit. We further hold that the notice of the hearing on its face was not jurisdictionally defective since any person by the exercise of reasonable diligence would be able to ascertain therefrom whether his property would be affected and in what manner.

## REFUSAL TO TRANSFER TO ANOTHER BOARD OF ADJUSTMENT

■ Homeowners contend that the failure of the Board to transfer the hearing to another Board of Adjustment resulted in a denial of due process. This contention is bottomed on an allegation of bias and prejudice of the Board of Adjustment I arising out of the prior litigation. We note that there is no section of the Phoenix Zoning Ordinance comparable to A.R.S. § 12–409 (or to Rule 42(f), Rules of Civil Procedure, 16 A.R.S.) allowing a peremptory challenge of a judge for bias and prejudice. Hence, to have any foundation whatsoever, Homeowners' motion must be upon evidence showing actual bias and prejudice bringing into play the common law rule that a party is entitled to a tribunal free from bias and prejudice. Conkling v. Crosby, 29 Ariz. 60, 239 P.2d 506 (1925); Hordyk v. Farley, 94 Ariz. 189, 382 P.2d 668 (1963). Unfortunately, the record made before the Board on this point fails to disclose any actual bias and prejudice, and, in fact, the one board member against whom a charge of conflict of interest was made, disqualified herself.

We therefore hold that Homeowners, having failed to prove actual bias and prejudice on the part of members of the Board, were not denied due process by denial of their motion for change of hearing board.

## DENIAL OF MOTION TO CONTINUE

■ Homeowners moved twice for a continuance of the hearing before the Board after completion of Camelback's evi-

dence, partially on the lateness of the hour (11:30 p. m. and 12:30 a. m., respectively) and partially on arguments that until Camelback had completed its evidence they had no knowledge as to exactly what Camelback sought by way of expansion, and hence did not have an adequate time to prepare. They contend a denial of this motion denied them due process. We have previously discussed the contention that Homeowners did not have an adequate opportunity to prepare and need not repeat our discussion on this point having found the contention without merit. As to the lateness of the hour, we need merely point out that generally motions for continuance are directed to the sound discretion of the tribunal to whom they are directed and rulings on such continuances will not be disturbed on appeal in the absence of a clear abuse of that discretion. Nordale v. Fisher, 93 Ariz. 342, 380 P.2d 1003 (1963); Kreisman v. Thomas, 12 Ariz.App. 215, 469 P.2d 107 (1970). Inherent in the concept of abuse of discretion is a showing of prejudice resulting from the exercise of that discretion. *See,* E. L. Jones Const. Co. v. Noland, 105 Ariz. 446, 466 P.2d 740 (1970); Tanner v. Pacioni, 3 Ariz.App. 297, 413 P.2d 863 (1966); Zier v. Shamrock Dairy of Phoenix, Inc., 4 Ariz.App. 382, 420 P.2d 954 (1966). Homeowners have failed to show how the lateness of the hour in any manner prejudiced their presentation. We therefore find no abuse of discretion in the denial of the motion to continue.

## FAILURE TO PLACE WITNESSES UNDER OATH

■ Homeowners next contend that the failure of the Board to place witnesses under oath was reversible error. The general rule appears to be that the failure to administer an oath to witnesses will not vitiate an administrative proceeding unless a statute expressly requires the administering of the oath. Bowling Club v. Toronto, 17 Utah 2d 5, 403 P.2d 651 (1965); Duffard v. City of Corpus Christi, 332 S.W.2d 447 (Tex.Civ.App.1960).

The applicable statute dealing with this issue provides:

"The ordinance shall provide for meetings of the board which shall be open to the public, for a chairman with power to administer oaths and take evidence . . . ." A.R.S. § 9–464, subsec. C.

In fulfillment of this statutory directive § 109(A)(1) of the Phoenix zoning ordinance provides:

"Each Board shall elect a chairman and vice-chairman from among its own members who shall have power to administer oaths and to take evidence."

■ We find nothing in these two legislative enactments which require expressly that witnesses appearing before a board of adjustment must be placed under oath. Rather, the power to administer oaths is given without indication that it is to be exercised in any way but at the chairman's discretion. Admittedly, having granted the power, the legislative bodies obviously intended that it should be exercised, and in our opinion, regularity and solemnity of proceedings of administrative agencies would be greatly enhanced by requiring an oath or affirmation of all witnesses. *See* Dunder v. Scuncio, 86 R.I. 370, 134 A.2d 400 (1957). However, in the absence of an express legislative directive that the oath must be administered in all cases, we will not invalidate an administrative proceeding upon the technical failure to place witnesses under oath. Moreover, Homeowners have failed to show that such a failure resulted in prejudicial error and our review reveals none.

## POWER OF THE SUPERIOR COURT TO MODIFY CONDITIONS IMPOSED BY THE BOARD

The last contention advanced by Homeowners is that the superior court lacked authority to modify the conditions attached to the special use permit in favor of Camelback without a cross-petition filed by them. In arguing this contention, Homeowners analogizes the situation to

that of the lack of authority of an appellate court to grant relief to an appellee without a cross-appeal. However, no cases are cited in support of this analogy. On the other hand, A.R.S. § 9–465, which pertains to judicial review of decisions of boards of adjustment, provides in part that:

> ". . . the court . . . on final hearing may reverse or affirm, wholly or partly, or may modify the decision reviewed."

This statute has been held to grant the superior court broader powers of review of decisions of boards of adjustment than are granted under the general statutes relating to writs of certiorari. Lewis v. Board of Adjustments of The City of Phoenix, 6 Ariz.App. 494, 433 P.2d 811 (1967).

We are of the opinion that under this statutory grant of judicial review power the superior court had authority to modify the decision of the Board in favor of a prevailing party before that Board without the necessity of a cross-petition.

For the foregoing reasons the judgment of the trial court is affirmed.

HAIRE, C. J., Division 1, and EUBANK, J., concur.