IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO


RICHARD E. LAMBERT, LTD.,    )
    )    2 CA-CV 2009-0022
    Plaintiff/Appellee,    )    DEPARTMENT A
    )
    )    O P I N I O N
    v.    )
    )
CITY OF TUCSON DEPARTMENT OF    )
PROCUREMENT,    )
    )
    Defendant/Appellant.    )
    )


APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20073264

Honorable John F. Kelly, Judge

REVERSED AND REMANDED


Durazzo & Eckel, P.C.
  By Patric E. Durazzo and Eric Hawkins        Tucson
        Attorneys for Plaintiff/Appellee

Mesch, Clark & Rothschild, P.C.
  By Melvin C. Cohen, Scott H. Gan and        Tucson
  Paul A. Loucks        Attorneys for Defendant/Appellant


H O W A R D, Chief Judge.

¶1        Appellant City of Tucson appeals from the superior court's judgment partially overturning the City Procurement Director's determination upholding liquidated damages assessed against appellee, Richard E. Lambert, Ltd. (hereinafter REL). The City also appeals the superior court's order granting REL's request for attorney fees. Because substantial evidence supports the Director's decision, we reverse the superior court.

**Facts and Procedural History**

¶2        We view the facts in the light most favorable to upholding the administrative decision of the City Procurement Director. *See Whiteco Outdoor Adver. v. City of Tucson*, 193 Ariz. 314, ¶ 7, 972 P.2d 647, 650 (App. 1998) (appellate court bound by board's factual findings); *cf. Pingitore v. Town of Cave Creek*, 194 Ariz. 261, ¶ 18, 981 P.2d 129, 132 (App. 1998) (we affirm administrative decision if supported by credible evidence); *see also Special Fund Div. v. Indus. Comm'n*, 182 Ariz. 341, 346, 897 P.2d 643, 648 (App. 1994). REL contracted with the City of Tucson to improve the city-owned Northwest Mansfield Park Neighborhood Center. Under the terms of the contract, REL was to improve a gymnasium building and add irrigation and landscaping to the sports fields surrounding the center. The contract required REL to begin work by January 5, 2004, and to work "promptly, regularly, diligently and uninterruptedly at such rate of progress as will insure full completion thereof within the time specified." The contract further provided: "If the Contractor is delayed on any portion of the Work for any reason whatsoever, he shall expeditiously proceed on other

2

Portions of the Work which are not affected by such delay." After numerous extensions, REL was required to substantially complete the project by February 3, 2005.

¶3        REL completed the project on December 19, 2005, 319 days after the agreed upon completion date. Pursuant to the terms of the contract, the City then assessed REL $500 per day in liquidated damages and retained the final $108,305.95 due on the project. REL appealed that decision to the City Contract Officer. The Contract Officer determined that REL was responsible for the delay in completion of the project and, therefore, found that the City was entitled to assess liquidated damages under the terms of the contract.

¶4        Pursuant to the terms of the Tucson City Procurement Code, REL appealed the Contract Officer's decision to the City Director of Procurement. *See* Tucson City Proc. Code § 28-76 ("Appeals from the decisions of the Contract Officer may be made to the Director" of Procurement.). The Director appointed a hearing officer, who held an evidentiary hearing and ultimately agreed with the Contract Officer that the City was entitled to liquidated damages. *See* Tucson City Proc. Code § 28-113(1) (director shall appoint hearing officer to decide matter). The hearing officer then submitted this recommendation to the Procurement Director, who affirmed it. *See* Tucson City Proc. Code § 28-114(2) (director may affirm, modify or reject recommendation of hearing officer).

¶5        REL filed a special action in superior court,[1] challenging the Director of Procurement's decision, relying upon a term of the contract granting REL a time extension

--------

[1]Neither party challenged this procedure and we do not decide its propriety.

in the event of "unforeseeable causes beyond the control and without the fault or negligence of the Contractor" such as "acts of God" and "acts of the City." *See also* Tucson City Proc. Code § 28-117. Both the City and REL filed cross-motions for summary judgment. The superior court granted REL's motion in part, concluding that the Procurement Director's factual findings were arbitrary, capricious, and unsupported by the facts, reduced the liquidated damages to $13,500 and awarded REL its attorney fees. The City appeals from this decision. *See* A.R.S. § 12-2101(B).

## Evidentiary Hearing

¶6 Relying upon Rule 4(f), Ariz. R. P. Spec. Actions, the City preliminarily contends that the superior court erred in granting partial summary judgment in favor of REL without holding an evidentiary hearing. Rule 4(f) states that if "a *triable issue of fact* is raised in an action under this Rule, it shall be tried subject to special orders concerning discovery." (Emphasis added.)

¶7 In granting partial summary judgment in favor of REL, the superior court did not resolve issues of fact. Rather, the court resolved legal issues involving whether substantial evidence supported the City Procurement Director's findings. *See Havasu Heights Ranch and Dev. Corp. v. Desert Valley Wood Prods., Inc.*, 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App. 1990) (whether substantial evidence supports administrative officer's findings is question of law). Accordingly, no evidentiary hearing was required, and we address the merits of the City's appeal.

**Summary Judgment**

¶8        The City argues that the Procurement Director's findings were supported by substantial evidence and therefore contends the superior court erred in setting them aside by granting partial summary judgment in REL's favor. Summary judgment is appropriate if "no genuine issues of material disputed facts remain and the moving party is entitled to judgment as a matter of law." *Woerth v. City of Flagstaff*, 167 Ariz. 412, 416, 808 P.2d 297, 301 (App. 1990). We review the superior court's decision to grant summary judgment de novo. *Liberty Mut. Fire Ins. Co. v. Mandile*, 192 Ariz. 216, 222, 963 P.2d 295, 301 (App. 1997).

¶9        When reviewing an administrative decision, the superior court must determine whether the administrative officer's "determination was arbitrary and capricious or an abuse of discretion." *Robertson v. Superior Court*, 136 Ariz. 440, 442, 666 P.2d 540, 542 (App. 1983), *citing* Ariz. R. P. Spec. Actions 3(c); *cf. Caretto v. Ariz. Dep't of Transp.*, 192 Ariz. 297, ¶ 7, 965 P.2d 31, 34 (App. 1998). In determining whether an administrative decision is arbitrary or capricious, the superior court "may not weigh the evidence on which the decision was based" and must affirm if the decision is supported by substantial evidence. *Ariz. Dep't of Pub. Safety v. Dowd*, 117 Ariz. 423, 426, 429, 573 P.2d 497, 500, 503 (App. 1977). And the superior court errs when it substitutes its own judgment for that of the administrative officer. *See Black v. City of Phoenix*, 157 Ariz. 93, 96, 754 P.2d 1268, 1371 (App. 1988); *see also Smith v. Ariz. Dep't of Transp.*, 146 Ariz. 430, 432, 706 P.2d 756, 758 (App. 1985).

5

¶10     Like the superior court, this court also determines whether the record contains any evidence to support the administrative decision. *Dowd*, 117 Ariz. at 426, 573 P.2d at 500; *see also Potter v. Ariz. Dep't of Transp.*, 204 Ariz. 73, ¶ 8, 59 P.3d 837, 840 (App. 2002). We do not re-weigh the evidence; we merely determine if substantial evidence exists to support the administrative officer's conclusions. *Dowd*, 117 Ariz. at 426, 429, 573 P.2d at 500, 503. In determining whether substantial evidence exists, "it is necessary to determine whether the [administrative] decision sought to be reviewed is without any evidence to support it, or is absolutely contrary to uncontradicted and unconflicting evidence upon which it purports to rest." *Id.* at 426, 573 P.2d at 500.

Construction Delay Law

¶11     Pursuant to the terms of the contract, REL was required to complete the entire project by a certain date. But the contract also provided REL was entitled to an extension of time to complete its work if the project was delayed because of "unforeseeable causes beyond [REL's] control." Although there is little substantive Arizona law on government project construction delay, "state courts naturally look for guidance in public contract law to the federal court of claims and the federal boards of contract appeals." *New Pueblo Constructors, Inc. v. State*, 144 Ariz. 95, 101, 696 P.2d 185, 191 (1985).

¶12     Under federal law, "[t]he term 'delay' implies a stopping or hindrance for some period." *Paul Hardeman, Inc. v. United States*, 406 F.2d 1357, 1361 (Ct. Cl. 1969). REL, as the contractor justifying untimely performance, had the burden of proving delay and of

6

proving that any delays in performance were excusable. *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 372 (1999); *cf. Clark v. Compania Ganadera de Cananea, S.A.*, 95 Ariz. 90, 94, 387 P.2d 235, 238 (1963) (breaching party in action for breach of contract has burden of proving "conditions which would excuse their nonperformance"). Pursuant to the terms of the contract, a delay is excusable when it is due to "unforeseeable causes beyond the control and without the fault or negligence of the Contractor." *See also CJP Contractors*, 45 Fed. Cl. at 372.

¶13        According to the general law of governmental contracts, REL also had the burden of proving that "the excusable event caused a delay to the *overall* completion of the contract." *Id.* (emphasis added). This requirement is consistent with the contract's provisions requiring REL to complete the entire project at a specified time and, if one portion of the project was delayed, to continue to work on other portions. An excusable delay affects the overall completion of a project when it affects the project's critical path.[2] *Youngdale & Sons Constr. Co. v. United States*, 27 Fed. Cl. 516, 550 (1993). Nevertheless, "'[a]n

---

[2]In its answering brief, REL briefly contends that critical path analysis is "one of several methods" it could have used to sustain its burden of proving excusable delay as to the overall completion of the contract. REL therefore argues that it was not required to present a critical path analysis. The only authority REL cites for this proposition, however, is the superior court's statement that the court in *Youngdale & Sons* relied upon "various methods, including the 'critical path analysis'" to determine whether a contractor was entitled to damages. Because, as we explain below, the record provides substantial evidence to support the Director of Procurement's determination that REL failed to sustain its burden of proving excusable delay as to the overall completion of the project by critical path analysis or any other method, we leave for another day the decision of whether critical path analysis is the *only* method of proving excusable delay.

interruption in one phase of the work . . . does not always result in an increase in the time necessary for total performance'" or overall completion. *Blinderman Constr. Co. v. United States*, 39 Fed. Cl. 529, 584 (1997), *quoting Paul Hardeman*, 406 F.2d at 1361.

¶14 The Procurement Director concluded that REL's performance had been delayed, in part, by (1) problems involving the relocation of a valley gutter used in the project, (2) a delay in establishing permanent power at the project work site, and (3) an arson fire that occurred approximately two months after the project was due to be completed.[3] But the Director further concluded that the *overall* completion of the work had not been delayed by these events, but rather by inadequate staffing and supervision by REL's landscaping subcontractor and other causes that were within REL's control. *See CJP Contractors*, 45 Fed. Cl. at 372.

¶15 The City claims that the record contains substantial evidence to support the Procurement Director's conclusion that REL failed to sustain its burden of proving that the arson fire, gutter relocation, and permanent power delay caused an excusable delay in the overall completion of the project. We address the evidence relating to each delay separately.

---

[3]REL also claimed, and the Procurement Director agreed, that the delay was caused by two other factors. But because REL does not argue on appeal that these factors caused the delay or were excusable, any argument concerning them is waived. *See* Ariz. R. Civ. App. P. 13(a), (b).

8

Arson Fire

¶16     The City first argues that substantial evidence was presented to support the Procurement Director's determination that the arson fire did not delay REL's overall completion of the project. *See CJP Contractors*, 45 Fed. Cl. at 372 (claimant has burden of proving not only that delay was excusable but also that delay delayed overall completion of project); *cf. Clark*, 95 Ariz. at 94, 387 P.2d at 238 (in a case involving breach of contract, breaching party has burden of proving "conditions which would excuse their nonperformance"). The City therefore claims that the superior court erred in setting aside the Procurement Director's conclusion as "unjustified."

¶17     Under the terms of the contract and its various amendments, REL was required to complete the project—including all building and irrigation work—by February 3, 2005. In March 2005, however, more than one month after REL was supposed to have finished work, an arson fire and subsequent water damage destroyed the gymnasium floor. The parties negotiated whether the damage necessitated complete replacement of the floor, eventually agreeing that it did. Due to difficulties obtaining materials to replace the floor, as well as other delays, REL did not replace the floor until November 22, 2005, more than eight months after the date of the fire.

¶18     But the final portion of the work that REL completed before the City accepted the project was the landscaping and irrigation system, not the gymnasium. According to the City's architect, on the date of the fire, REL still had not completed much of the landscaping

and roofing on the project. Moreover, even before the fire, REL's work on the project was "already six months behind schedule." REL needed to complete a playground near the gymnasium, as well as to construct stairs, a walkway, and various walls, and to install a sump pump. REL also had not completed extensive concrete, stucco and asphalt work, as well as demolition and various building projects, all of which were required under the terms of the contract. None of this work, according to the architect, was "dependent on replacing the . . . [gymnasium] floor or any of the fire damage that occurred inside the building." Nevertheless, REL waited until after it completed the gymnasium flooring to complete this significant amount of work, even though testimony was presented that it could have "progressed onward" with the remainder of the project during the time it was waiting for materials to replace the floor.

¶19        Under the terms of the contract, REL was obligated to "progress[] onward" with the remainder of the project in the event that one portion of the project was delayed. That REL failed to do this constitutes substantial evidence for a reasonable Procurement Director to conclude that the arson fire "had no impact on [REL's] ability to complete building and site work that was incomplete on the date of the fire." Accordingly, although the fire caused a delay in a portion of the project, substantial evidence supports the Procurement Director's decision that it was merely a "distraction" and had no effect on REL's *overall* completion of the project's objectives, which included building construction apart from the gymnasium as well as extensive irrigation and landscaping. The Procurement

10

Director reasonably could have concluded REL should have accomplished such work during the time it was negotiating the extent of floor replacement and awaiting the arrival of the floor replacement materials. *See Dowd*, 117 Ariz. at 426, 573 P.2d at 500 (administrative officer, not superior court, weighs evidence).

¶20 REL claims, however, that the Procurement Director's conclusions were unsupported because the City admitted that the arson fire constituted excusable delay. Indeed, the City Contract Officer testified that the City had considered stopping its assessment of liquidated damages after the arson fire. But, although REL is correct that fire can be an excusable delay under the terms of its contract, the City was still entitled to assess liquidated damages unless REL sustained its burden of proving that the fire had caused delay to the *overall* completion of the project. *See CJP Contractors*, 45 Fed. Cl. at 372. And, the city eventually reconsidered whether the fire was excusable delay because the non-fire related portions of the project were so far from completion. The superior court therefore erred in determining that the Procurement Director's conclusions were unjustified and unsupported by the evidence.

Valley Gutter Relocation

¶21 The City also contends that substantial evidence was presented to support the Procurement Director's conclusion that the valley gutter redesign did not entitle REL to excusable delay in performance. *See Dowd*, 117 Ariz. at 426, 429, 573 P.2d at 500, 503 (superior court must affirm administrative decision if supported by substantial evidence). In

11

its challenge of the City's assessment of liquidated damages for late performance, REL claimed that the incorrect plan for the placement of a gutter at the project work site resulted in excusable delay in completion of the project. The Procurement Director disagreed and concluded that "[w]hatever delays occurred because of the valley gutter relocation . . . were minor in scope, short in duration and did not affect other construction activities that were holding up substantial [or overall] completion" of the project.

¶22 The original project design called for booster pumps to be placed too close to the gymnasium building. It was not until March 2005, however, that REL realized it was unable to move the booster pumps, because the project's original design called for a gutter to be placed in the only other area feasible to install them. REL notified the City of the problems surrounding the gutter location, and the City's project architect redesigned the gutter to be constructed in a new location further from the booster pump site. Due to various design difficulties, however, the final design for the new gutter location was not completed until June 2005, several months after the problem arose. REL claims this delay resulted in delay to the overall project.

¶23 A City inspector testified, however, that the gutter relocation delayed the project "[o]nly during the period of time in which the decision [about the new design and location] was being made." The inspector further stated that any delay had only a "slight impact" on the project's completion. And we have already noted that in March 2005, when REL first became aware of a potential delay due to the gutter's initial location, significant

work remained to be completed on the project. Apart from the irrigation, which REL contends was delayed by the gutter placement, REL also needed to complete stuccoing and demolition, as well as construct a playground and build various walls and other additions to the gymnasium that had not been delayed by difficulties in obtaining new flooring. Under the terms of the contract requiring REL to "expeditiously proceed" on portions of the project unaffected by any delay, REL should have completed this work during the period in which it was awaiting the architect's new design for the gutter placement, thereby offsetting any delay caused by the gutter relocation.

¶24        Evidence was also presented from which the Procurement Director could have concluded that REL performed irrigation and landscaping work while waiting for the new gutter design plans. REL requested payment for $19,128.00 worth of landscaping work it claimed had been completed in April 2005 and $11,884.00 worth of landscaping work it claimed to have completed in March 2005. REL's May 2005 work schedule estimated that the irrigation and landscaping would be completed by the end of June. Ultimately, however, it took approximately six months for REL to finish the project. The Procurement Director could have determined from the record that, although REL was working on irrigation, the irrigation was completed more slowly than usual due to "excessive amount[s] of failures" each time it was tested. Accordingly, although the gutter relocation delayed certain aspects of the project, the hearing officer could reasonably have found it did not delay the project's overall completion, including portions of REL's landscaping work.

13

¶25     REL contends, however, that the City admitted that the gutter relocation and redesign caused delay. REL therefore argues that the delay was excusable because it was caused by the City. But even assuming the City did cause the gutter relocation delay, REL does not explain how the delay resulted in a delay to the overall completion of the project. *See CJP Contractors*, 45 Fed. Cl. at 372 (claimant's burden to prove not only that delay excusable but also that delay caused delay in overall completion of project). And as we have already explained, there was substantial evidence in the record supporting the Procurement Director's finding that any delay caused by the gutter relocation did not delay the overall project completion because it "did not affect other construction activities that were holding up substantial completion" of the project. *See Dowd*, 117 Ariz. at 426, 429, 573 P.2d at 500, 503 (administrative officer, not superior court, weighs evidence; substantial evidence exists when any evidence supports administrative decision). The superior court erred in setting aside the Procurement Director's findings that the gutter relocation did not delay the overall completion of the project.

Power Delay

¶26     The City finally asserts that substantial evidence was presented to support the Procurement Director's conclusion that the lack of permanent power did not result in an excusable delay. The City therefore argues that the superior court erred in setting aside the Procurement Director's conclusion and in finding that "REL was entitled to excusable time for the delay in extending permanent power to the site." *See Dowd*, 117 Ariz. at 429, 573

14

P.2d at 503 (superior court must affirm administrative decision if supported by substantial evidence).

¶27 Under the terms of the contract, REL was required to "make application for permanent utility service from the . . . electric compan[y]." In order to obtain permanent power, REL first needed to secure and document an easement for Tucson Electric Power Company (TEP). Due to various problems involving that easement, REL was not able to secure permanent power until February 11, 2005. REL contends that the City was responsible for the delay in obtaining permanent power and also asserts this delay delayed the entire project. The Procurement director disagreed, however, and stated the following:

> Unquestionably, there was a delay in the establishment of permanent power to the site. . . . The critical point of [REL]'s claim analysis is whether, before the electrical service was energized, [REL] had any need for that power. Without a causal connection, the fact of delay is irrelevant. As the evidence in this hearing shows, [REL] had no need for permanent power inside the building until March 2005 and the evidence further shows that the irrigation subcontractor had no need for permanent power until late 2005. As such, there is no causal connection between the delay in the establishment of permanent power by TEP at the site as to justify additional days for [REL]'s completion of the construction (to avoid liquidated damages) or to extend the general conditions for which it would be compensated.

¶28 The record contains evidence that throughout the period during which REL lacked permanent power by virtue of the TEP delay, REL still had access to temporary power sources. And testimony was presented that REL did not need permanent power to finish the majority of the project. Accordingly, even if, as REL contends, the City was responsible for

15

the delay in permanent power, the Procurement Director reasonably could have concluded that REL should have relied upon temporary power sources to complete any gymnasium and irrigation work requiring electricity rather than waiting for permanent power to be established. *Cf. Paul Hardeman*, 406 F.2d at 1361 (although construction company unable to use cranes during period of construction and therefore incurred extra costs, "coincidence of [lack of cranes] and the additional expense does not necessarily imply a causal link between them"). REL admits that it was able to perform initial testing of the irrigation system using temporary power. And although REL contends that it could not complete the entire irrigation project without permanent power, permanent power was established months before REL completed the landscaping and irrigation in December 2005.

¶29 REL claims, however, that the lack of permanent power prevented it from closing irrigation trenches before the irrigation system had been tested. REL therefore asserts that "[s]ite work, landscaping and other work could not continue until the trenches were closed." But even assuming that a lack of permanent power delayed site work, landscaping, and other portions of the project, REL has not explained why the remaining six weeks of work took seven months to complete. As we explained above, substantial evidence was presented to support the conclusion that any delay in obtaining permanent power did not delay the overall completion of the project. *See Dowd*, 117 Ariz. at 426, 429, 573 P.2d at 500, 503 (administrative officer, not superior court, weighs evidence; substantial evidence exists when there is any evidence to support administrative decision). The superior court

16

erred in setting aside the Procurement Director's determination that, "[r]egardless of any electrical service establishment delay, [the overall completion of] this project was not delayed because of" any delay in obtaining permanent power from TEP.

¶30 REL also appears to contend, however, that the power delay constituted excusable delay to its overall performance because the City was not forthcoming about its prior difficulties in obtaining permanent power for the project from TEP. But the contract specifically required REL to obtain power and compensated it for doing so. And even if the City had been forthcoming about its difficulties obtaining power, permanent power still would have been delayed. Again, substantial evidence supports the conclusion that REL could have completed the majority of its building and irrigation work without permanent power; it appears from the record that REL simply lacked the workforce and organization to do so in a timely fashion. *See Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399, ¶ 35, 79 P.3d 86, 96 (App. 2003) (substantial evidence exists if conclusion supported by record). Any lack of honesty on the part of the City did not cause delay to REL's overall completion of the project. The superior court therefore erred in setting aside the Procurement Director's findings.

¶31 On appeal, REL only disputes the Procurement Director's conclusions concerning the arson fire, gutter relocation and permanent power delay. Because these conclusions were supported by substantial evidence, we conclude that the superior court erred in setting aside the Procurement Director's findings and in granting partial summary

17

judgment to REL.[4] We therefore vacate the decision of the superior court and reinstate that of the City Procurement Director.

**Attorney Fees**

¶32 The City also requests that this court vacate the superior court's award of attorney fees to REL. In light of our reversal of the superior court's partial grant of summary judgment, REL is no longer the prevailing party in this case, and is, therefore, not entitled to fees pursuant to A.R.S. § 12-341.01(A) (prevailing party in contract case may be awarded attorney fees). Consequently, we vacate the superior court's order awarding attorney fees to REL.

¶33 Relying on the contract with REL and § 12-341.01, the City also requests that this court award its attorney fees in superior court and on appeal.[5] The City is the prevailing party, and we grant its request for attorney fees on appeal and in superior court, in compliance with Rule 21, Ariz. R. Civ. App. P. *See also Winter v. Coor*, 144 Ariz. 56, 65, 695 P.2d 1094, 1103 (1985) (awarding attorney fees to prevailing party in contract dispute, upon reversal of superior court order).

---

[4]Additionally, because we conclude that substantial evidence supported the Procurement Director's determination that all three delays were inexcusable, we need not address the City's contention that REL failed to properly notify the City of any delays, thereby waiving its claims that the delays were excusable.

[5]We have not found any contract provision in the record providing for the award of attorney fees and, therefore, do not consider the City's request under the contract.

**Conclusion**

**¶34** In light of the foregoing, we vacate the superior court's grant of partial summary judgment and attorney fees in favor of REL. We reinstate the decision of the Director of Procurement and award the City its attorney fees incurred in the superior court and on appeal upon its compliance with Rule 21. Finally, we remand this matter to the superior court for entry of judgment and any further action in accordance with this decision.

_____
JOSEPH W. HOWARD, Chief Judge

CONCURRING:

_____
PHILIP G. ESPINOSA, Presiding Judge

_____
JAMES A. SOTO, Judge*

*A judge of the Superior Court of Arizona authorized and assigned to sit as a judge on the Court of Appeals, Division Two, pursuant to the Arizona Supreme Court Order filed Sept. 17, 2009.