NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Petitioner*,

*v.*

THE HONORABLE MYRA HARRIS, Commissioner of the SUPERIOR
COURT OF THE STATE OF ARIZONA, in and for the County of
MARICOPA, *Respondent Commissioner,*

HOWARD LEE MITCHELL, III, *Real Party in Interest.*

No. 1 CA-SA 14-0184
FILED 12-04-2014

Petition for Special Action from the Superior Court in Maricopa County
No. LC2014-000289-001 DT
The Honorable Myra A. Harris, Commissioner

**JURISDICTION ACCEPTED; RELIEF GRANTED**

COUNSEL

Scottsdale City Prosecutor's Office, Scottsdale
By Kenneth M. Flint
*Counsel for Petitioner*

Howard Lee Mitchell, III, Scottsdale
*Real Party in Interest*

---

**MEMORANDUM DECISION**

---

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Michael J. Brown joined.

---

**J O N E S**, Judge:

¶1        This matter arises from the Scottsdale City Court's termination of Howard Lee Mitchell III's possessory rights in one dog, thirteen birds and fourteen tortoises, pursuant to Chapter 4, Article 1 of the Scottsdale Revised Code.  The City of Scottsdale, a political subdivision of the State of Arizona, petitions for special action review of the superior court's order on appeal (1) reversing the city court's termination and support order for insufficient evidence, and (2) ultimately suppressing evidence the superior court deemed to have been obtained in violation of the Fourth Amendment.  For the following reasons, we accept jurisdiction, reverse the superior court's order, and remand with directions to reinstate the city court's order.

**FACTS AND PROCEDURAL HISTORY**

¶2        In May 2013, an Arizona Humane Society representative requested the Scottsdale Police Department perform a welfare check on animals reportedly left unattended at Mitchell's home while he was hospitalized.  Two officers were dispatched, one of which was an emergency animal medical technician who had received specific training in animal cruelty and neglect investigations.  Upon arrival, and prior to proceeding onto the Mitchell property, the officers looked over a wall from an adjoining property into Mitchell's backyard and observed two dead tortoises "in various stages of decomposition."  The officers then entered his backyard through an unlocked gate and discovered an additional seven or eight live tortoises in what was perceived by the officers to be the "typical article hoarder backyard."  Although the yard was overgrown and there were several puddles of water, there was no fresh food or water for the tortoises. The officers photographed a tortoise eating its own feces, and did not observe any other available food.  The backyard contained a pool that was empty and unfenced, such that tortoises could fall in and become trapped.

¶3         When the officers reached the back door of Mitchell's house, they detected a burning or smoldering smell, "like an electrical fire," coming from inside the home. The smell became stronger when the flap of the dog door was opened. The officers then knocked on the front and back doors, which induced barking and bird calls. After receiving no other response, the officers entered the unlocked back door to investigate the source of the "electrical fire" smell.

¶4         Inside Mitchell's home, officers discovered an "animal hoarding house" with narrow pathways, which required officers to turn sideways between piles of debris to navigate the structure. They observed animals throughout the home, including at least three birds living outside their cages. The officers did not see any available dog or bird food, and there was no indication anyone was actively caring for the animals. The residence was littered with spider webs and debris across every available surface, rodent and bird feces covered the walls and furniture, and there were streaks, stains, and burn marks on the kitchen walls. Rat traps and dead mice were present throughout the house. The floors were covered with old birdseed and feces, and it was obvious to the officers that neither the bird cages, nor the toilet, had been cleaned in a long time. Water bowls had been left out, but by then contained only a small amount of water.

¶5         The birds themselves had greasy, tattered, and thinning feathers, overgrown beaks and toenails, and did not appear healthy. One was compared to a Thanksgiving turkey, as it had no feathers on its chest. Some birds had no food in their cages; others had been provided animal crackers and pretzels — items devoid of nutritional value.

¶6         The officers were unable to locate the source of the smell of smoke, and requested the Scottsdale Fire Department respond. Upon arrival, firefighters traced the burning smell to a shorted-out microwave, which they unplugged and removed from the home. They described Mitchell's home as "a deathtrap" and posited it would have caught fire within a couple hours had no one intervened. The City determined the residence was "unsafe to occupy" and condemned the property.

¶7         By this time, Mitchell had been hospitalized for three days. When questioned in the hospital, Mitchell told officers he had made no arrangements for the animals' care during his absence. Mitchell believed he had provided the animals with enough food and water for thirty days.

¶8         The City seized fourteen living tortoises, thirteen birds and one dog from Mitchell's home, and removed five dead tortoises. A

veterinarian examined the animals and testified they were "very stressed, distraught, showing nervous behavior, vocalizing," and exhibiting behavior indicative of psychological damage. The dog was obese and in need of antibiotics. Each bird suffered from some disease or medical condition, was malnourished from a diet of cheese puffs, pretzels and animal crackers, and one bird had tumors. The tortoises were generally healthy, although several had paralyzed back legs. A veterinarian from the Arizona Humane Society testified the tortoises were deprived of fresh water, a proper diet, and a safe environment — one free from dogs, pools and other dangers. The veterinarian described the conditions in Mitchell's home as "deplorable" and further stated she "would not send any animal to those conditions again."

¶9          Although it did not pursue criminal charges for animal cruelty, the City filed a civil action to terminate Mitchell's possessory rights in the animals, pursuant to Scottsdale Revised Code (S.R.C. or Code) section 4-12(a).[1] An evidentiary hearing was held, at which Mitchell admitted neglecting his home and yard as a result of his congestive heart failure, but denied neglecting the animals. He testified that he had anticipated his hospitalization, and planned to be gone for approximately one week. Contrary to statements made in the hospital, Mitchell testified he arranged for a neighbor to check on the animals, but acknowledged he did not anticipate the animals' water or food would need to be refilled during that time.

¶10         The neighbor testified the animal crackers were treats rather than part of the animals' regular diet. He blamed the City for emptying the birds' cages onto the floor of Mitchell's home, maintained that what officers described as rodent feces was actually birdseed, and testified Mitchell fed the tortoises a bale of alfalfa every two weeks.

¶11         Mitchell self-identified as an expert on the raising of exotic birds and animal behavior, and testified that the dead and decomposing tortoises were left in the yard to provide the living tortoises with "toys" for jousting, and that some of the tortoises were lame because they were elderly. He stated the dog, a service dog, received recent veterinary care and was losing weight, and, contrary to the witnesses' observations, there was dog food available in the home. He further challenged the testimony

---

[1] Absent material revisions from the relevant date, we cite the current version of the code or statute.

regarding proper care and behavior of birds and tortoises based upon his personal education and experience.

¶12          The city court ultimately found the City had proven by a preponderance of the evidence that Mitchell had neglected the seized animals, entered Judgment for the City, and ordered Mitchell to pay $750.00 for the cost of their care following removal.  On appeal, the superior court found, first, that insufficient evidence had been presented to support the city court's findings and resulting forfeiture.  It then suppressed all evidence presented by the City, finding it had been illegally obtained because the officers did not obtain a search warrant prior to entering Mitchell's property.  The City petitioned this Court for special action review.

## JURISDICTION

¶13          "Whether to accept special action jurisdiction is for this court to decide in the exercise of our discretion," *Potter v. Vanderpool ex rel. Cnty. of Pinal*, 225 Ariz. 495, 498, ¶ 6, 240 P.3d 1257, 1260 (App. 2010) (citing *State v. Campoy*, 220 Ariz. 539, 542, ¶ 2, 207 P.3d 792, 795 (App. 2009)), and "[a] primary consideration is whether the petitioner has an equally plain, speedy and adequate remedy by appeal." *Am. Family Mut. Ins. Co. v. Grant*, 222 Ariz. 507, 511, ¶ 9, 217 P.3d 1212, 1216 (App. 2009).  Other considerations include whether the case raises issues of statewide importance, issues of first impression, pure legal questions, or issues that are likely to arise again. *Luis A. v. Bayham-Lesselyong ex rel. Cnty. of Maricopa*, 197 Ariz. 451, 452-53, ¶ 2, 4 P.3d 994, 995-96 (App. 2000) (citing *Andrade v. Superior Court*, 183 Ariz. 113, 115, 901 P.2d 461, 463 (App. 1995)).

¶14          Because this case arises from Mitchell's successful appeal of the city court's order to the superior court, the sole avenue for appellate review is through special action.  *See* Ariz. Rev. Stat. § 22-375 (prohibiting appeal from a final judgment of the superior court in an action appealed from a city court unless the action "involves the validity of a tax, impost, assessment, toll, municipal fine or statute"); *State v. Superior Court ex rel. Norris*, 179 Ariz. 343, 344, 878 P.2d 1381, 1382 (App. 1994).  Additionally, we view the application of Fourth Amendment principles to the entry onto Mitchell's property to be a purely legal question. *See State v. Estrada*, 209 Ariz. 287, 289, ¶ 2, 100 P.3d 452, 453 (App. 2004) (stating the issue of whether a search violated the Fourth Amendment was a legal conclusion requiring *de novo* review).  We therefore accept jurisdiction of this special action.

**DISCUSSION**

I.      **The City was Authorized by S.R.C. § 4-11(a) to Go onto Mitchell's
        Property to Perform a Welfare Check on the Animals.**

**¶15**         We review *de novo* the legal determination of whether a
government actor's entry upon private property in the absence of a warrant
was reasonable. *State v. Davolt*, 207 Ariz. 191, 202, ¶ 21, 84 P.3d 456, 467
(2004) (citing *State v. Valle*, 196 Ariz. 324, 326, ¶ 6, 996 P.2d 125, 127 (App.
2000)). The superior court suppressed "evidence about the birds, the
tortoises, and the dog" because it concluded the officers needed a warrant
to lawfully enter Mitchell's property. We disagree.

**¶16**         As a matter of public health, safety and welfare, Chapter 4 of
the S.R.C. — the City's animal cruelty code — manifests an explicit intent
to provide for the health and welfare of the animals. S.R.C. § 4-1. To help
promote this intent, S.R.C. § 4-11(a) provides:

> A peace officer or a city agent may enter property pursuant to
> a valid arrest or search warrant, under exigent circumstances
> or if an animal is in plain view, and the officer has probable
> cause to believe that an animal was subjected to or
> instrumental in a violation of [Chapter 4, Article 1 (Animal
> Cruelty)].

**¶17**         The Code expressly authorizes entry by law enforcement (a)
with a warrant, (b) under exigent circumstances, or (c) if an animal is in
plain view, and probable cause exists to support violation of the Code. In
the immediate case, it is undisputed that law enforcement officers were
advised that multiple animals were left unattended at Mitchell's property
for a week-long period. The record is likewise clear that, upon arrival and
without entering Mitchell's property, the officers looked over a six-foot
fence to observe two dead and decomposing tortoises in Mitchell's
backyard.

**¶18**         Based upon these undisputed facts and application of the
specific provisions of S.R.C. § 4-11(a), upon their arrival at Mitchell's
residence, but before entering the property, the officers observed the dead
and decomposing tortoises "in plain view." *See United States v. Wheeler*, 641
F.2d 1321, 1328 (9th Cir. 1981) (Choy, J., concurring) (finding no legitimate
expectation of privacy from a visual intrusion into a yard where the "six
foot fence [surrounding the yard] . . . could easily be looked over by a
person six feet or taller in height"). Probable cause was established based
upon what was clearly apparent through personal, visual observation, "that

an animal was subjected to . . . a violation of" the animal cruelty code. S.R.C. § 4-11(a). With that, the officers acted reasonably in entering Mitchell's property to perform a welfare check.

¶19 We specifically reject the suggestion that officers were required to observe living animals in immediate distress to authorize entry onto property. Accepting this argument would render the distinction between the Code's clearly alternative provisions allowing entry onto the property where there were "exigent circumstances" or an animal "in plain view" meaningless. We discern no reason to deviate from the plain language of the Code. *See Thomas & King, Inc. v. City of Phx.*, 208 Ariz. 203, 206, ¶ 9, 92 P.3d 429, 432 (App. 2004) (interpreting municipal ordinances using the traditional rules of statutory construction); *State v. McDermott*, 208 Ariz. 332, 334-35, ¶ 5, 93 P.3d 532, 534-35 (App. 2004) ("[W]e . . . presume that the legislature does not include statutory 'provisions which are redundant, . . . [or] superfluous . . . .'" (quoting *State v. Moerman*, 182 Ariz. 255, 260, 895 P.2d 1018, 1023 (App. 1994))).

¶20 Additionally, we need not reach the issue of whether the officers' "plain view" observation of the dead and decomposing tortoises in the backyard was sufficient to permit entry into Mitchell's home. While lawfully within Mitchell's yard, the officers observed a strong smell of smoke emanating from the house that was enhanced when the dog door was opened outward, and heard animal noises coming from within the home. Based upon these facts, we agree with the superior court that independent exigent circumstances existed, and therefore a warrant was not required to enter the home. *See Michigan v. Tyler*, 436 U.S. 499, 508 (1978) ("A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'"); *Mazen v. Seidel*, 189 Ariz. 195, 197, 940 P.2d 923, 925 (1997) (recognizing fire or medical emergency as exigent circumstances justifying warrantless search) (citations omitted).

¶21 The City was therefore authorized by S.R.C. § 4-11(a) to enter Mitchell's yard and, through the exigency discovered once they were rightfully on the property, to enter into his home. Both "plain view" and exigent circumstances are well-settled and long standing exceptions to the Fourth Amendment's warrant requirement. *See, e.g., Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982) (recognizing "plain view" exception to the Fourth Amendment permits law enforcement to seize evidence "when it is discovered in a place where the officer has a right to be") (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465-66 (1971), and *Harris v. United States*, 390 U.S. 234, 236 (1968)); *New York v. Quarles*, 467 U.S. 649, 653 n.3 (1984) (discussing "long recognized . . . exigent-circumstances exception . . . where

the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment") (internal quotations and citations omitted). Accordingly, we find no constitutional violation warranting suppression under the circumstances presented, and conclude evidence obtained during the welfare check was properly admitted during the termination hearing.

## II. Substantial Evidence Supported Termination of Mitchell's Possessory Interest in the Animals.

**¶22** Having determined there was no error in admission of evidence at the termination hearing, we next consider whether the superior court erred in reversing the city court's order terminating Mitchell's possessory interest in the animals. The question of whether substantial evidence exists to support the city court's order raises a question of law. *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prods., Inc.*, 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App. 1990) (citing *Milton v. Harris*, 616 F.2d 968, 975 n.10 (7th Cir. 1980), and *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972)). Therefore, we review *de novo* whether substantial evidence supported the city court's decision.

**¶23** Substantial evidence exists even if the record also supports a different conclusion. *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App. 1984) (citing *Webster v. State Bd. of Regents*, 123 Ariz. 363, 365-66, 599 P.2d 816, 818-19 (App. 1979)). The superior court errs when it substitutes its own judgment for that of the factfinder — here, the city court — and may not re-weigh the evidence upon which the decision was based. *Richard E. Lambert, Ltd. v. City of Tucson Dep't of Procurement*, 223 Ariz. 184, 187, ¶¶ 9-10, 221 P.3d 375, 378 (App. 2009). Thus, "our respective roles begin and end with determining whether there was substantial evidence to support the [underlying city court] decision," *Havasu Heights*, 167 Ariz. at 387, 807 P.2d at 1123, and the city court's determination may be overturned only if it "is without any evidence to support it, or is absolutely contrary to uncontradicted and unconflicting evidence upon which it purports to rest." *Ariz. Dep't of Pub. Safety v. Dowd*, 117 Ariz. 423, 426, 573 P.2d 497, 500 (App. 1977) (citing *E. Camelback Homeowners Ass'n v. Ariz. Found. for Neurology & Psychiatry*, 18 Ariz. App. 121, 126, 500 P.2d 906, 911 (1972)).

**¶24** Often, where the record could support different conclusions, the trial court's decision rests upon its determination of the credibility of the various witnesses. On such occasions, those determinations are entitled to deference, whether explicitly stated or implicit in its ruling, where there

is *any* support in the record. *See id.* (citing *E. Camelback Homeowners*, 18 Ariz. App. at 126, 500 P.2d at 911). The rationale of this rule has been explained as follows:

> [T]he predicate upon which our deference is given to the finder of fact is the assumption that he has indeed had the opportunity to look the witness in the eye and reach a conclusion with respect to his veracity or lack thereof. If this underpinning of judicial review is withdrawn, the appellate court has been deprived of the assistance which it demands in cases of conflicting evidence. If the . . . decision-maker and this court are both reaching a decision upon the "cold record" the integrity of the legal process not only falters, it fails. In cases of conflicting evidence, meaningful appellate review requires that the conflict be resolved by something more personal than a sterile resort to pages of hearing transcripts.

*Ritland v. Ariz. State Bd. of Med. Examn'rs*, 213 Ariz. 187, 190, ¶ 10, 140 P.3d 970, 973 (App. 2006) (quoting *Adams v. Indus. Comm'n*, 147 Ariz. 418, 421, 710 P.2d 1073, 1076 (App. 1985)); *see also Hutcherson v. City of Phx.*, 192 Ariz. 51, 53, ¶ 12, 961 P.2d 449, 451 (1998) ("Our reason for deference is clear. 'The [fact finder] sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the [decision] which cannot be recreated by a reviewing court from the printed record.'" (quoting *Reeves v. Markle*, 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978))). Failure to give appropriate regard to the city court's resolution of competing facts and opinions precludes "meaningful appellate review," and is error.

**¶25** Pursuant to S.R.C. § 4-3, and as pertinent here, a person commits animal neglect by "failing to provide basic care for an animal . . . [or] causing needless suffering or injury to the animal." Basic care is defined as "care sufficient to sustain the health and well being of an animal," and includes, *inter alia*, "[f]ood of sufficient quantity and quality to allow for normal growth or maintenance of body weight," "[o]pen or adequate access to potable water in sufficient quantity to satisfy the animal's needs,"[2] and "[f]reedom from . . . lack of sanitation . . . ." S.R.C. § 4-2(c)(1), (2), (6).

---

[2] The Code specifically states that "[a]ccess to a swimming pool is not adequate access to potable water." S.R.C. § 4-2(c)(2).

¶26        Applying the principles stated above, it is clear the city court, which took the testimony and "looked the witnesses in the eye," did not find Mitchell's testimony credible, or accept that either the conditions of his home or the circumstances surrounding the care to be provided the animals during his week-long hospitalization complied with the Code or were appropriate to protect the animals that were removed. Therefore, nor do we.

¶27        Rather, we find there is substantial evidence in the record to support the city court's determination that the animals were neglected by Mitchell's failure to provide sufficient *nutritious* food or access to potable water. Substantial evidence also existed to support the finding by the city court that the animals were subject to grossly unsanitary conditions — the dog and birds by virtue of being left in an environment of, among other circumstances, "wall to wall feces," and the tortoises for being left in a yard containing at least five rotting animal carcasses "in various stages of decomposition" — both facts which Mitchell does not dispute.

¶28        Although persons testifying on behalf of the City may not have professed expertise in regard to rare species of birds or tortoises, what was discovered at Mitchell's property did not require specialized knowledge. The circumstances at the property were apparent; animals, whether rare and exotic or utterly commonplace, were dead and dying, and witnesses testified to the poor condition and apparent neglect the animals had suffered. Mitchell presented no evidence to counter the actual observations of officers and laypersons, who were present when the animals were discovered and removed, that sufficient appropriate and nutritious food had not been provided for the duration of his hospital stay, and the overall condition of the animals, specifically, and the condemned property, generally, belied any argument that it was a recently created condition. To the extent the animals experienced any adverse effect from these conditions, such constituted "needless suffering or injury."

**CONCLUSION**

¶29        We reverse the order of the superior court and remand with directions to reinstate the city court's order terminating Mitchell's possessory interest in one dog, fourteen tortoises and thirteen birds and imposing a $750.00 penalty against Mitchell for the cost of their care. Neither party requests fees on appeal, and therefore, none are awarded. As

the prevailing party, the City is entitled to its costs on appeal contingent upon its compliance with Arizona Rule of Procedure for Special Actions 4(g) and Arizona Rule of Civil Appellate Procedure 21.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh